Argued and submitted October 7, decisions of Court of Appeals and trial court reversed and the case is remanded to trial court December 15, 1987, reconsideration denied March 1, 1988

STATE OF OREGON,
*Respondent on Review,*

*v.*

MICHAEL FRANK DIMEO,
*Petitioner on Review.*

(CC 84-1088; CA A40044; SC S34062)

747 P2d 353

Stephen A. Houze, Portland, argued the cause for petitioner on review. With him on the petition was Sharon A. Williams, Portland.

Terry Ann Leggert, Assistant Attorney General, Salem, argued the cause for respondent on review. With her were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

JONES, J.

## JONES, J.

Defendant was convicted of conspiracy to deliver a controlled substance and possession of cocaine. He appealed to the Court of Appeals, assigning as error the trial court's denial of his motion to suppress evidence gained from tape recorded telephone conversations between defendant and John McEachern and from the search of his automobile. The information obtained from the recording of the telephone conversations led to defendant's arrest and subsequent search of his automobile. The Court of Appeals affirmed defendant's conviction. *State v. Dimeo,* 84 Or App 491, 734 P2d 391 (1987). We reverse the decision of the Court of Appeals.

Defendant relies on two points for reversal: First, defendant asserts that the evidence obtained from the telephone conversations between McEachern and himself should have been suppressed because McEachern did not consent to the recording of the conversations. Second, defendant asserts that the search of his automobile was unlawful because the affidavit upon which the search warrant was based was insufficient to establish probable cause to believe that contraband would be found in the vehicle.

We take the facts from the Court of Appeals opinion, the findings of fact of the trial court and defendant's brief. On November 27, 1984, a Portland Police Bureau narcotics officer arrested McEachern for possession of cocaine and conspiracy to deliver cocaine. Police seized a pound of cocaine from him. Shortly after his arrest, McEachern was questioned by Portland Police narcotics officers. At that time, he gave written consent for a search of his house, freely admitted that there was marijuana there, and gave its precise location within the house. Later, a second narcotics officer explained the charges to McEachern and the possible sentences he would face if convicted. The second officer also told McEachern that if he would help the police catch his supplier, the district attorney would be told about his cooperation. McEachern repeatedly requested to see an attorney before deciding to cooperate with the police, but his requests were ignored by the officers.

Almost four hours after his arrest, McEachern agreed to the police's recording of telephone conversations between himself and defendant. McEachern knew that the police were listening when he was conversing with defendant over the

telephone. A series of four telephone conversations between McEachern and defendant were overheard and tape recorded by the police. As a result of these conversations, McEachern agreed to meet defendant at a shopping mall to purchase cocaine.

McEachern went with the police to the shopping mall. There, he and the police observed defendant drive up to the mall, get out of his car and enter the mall. A short time later, defendant walked from the shopping mall to McEachern's car and was arrested. Defendant was advised of his *"Miranda"* rights to remain silent. When no drugs were found on his person, defendant was asked for consent to search his car. Defendant refused to grant the police permission to search his car without a warrant. As a result, defendant's car was impounded. Upon obtaining a warrant, the police searched defendant's car for evidence of the crimes for which he had been arrested. The search revealed cocaine and a gun registered to defendant.

After defendant's indictment, pretrial hearings were held. Defendant moved to suppress his statements made during the recorded telephone conversations and the evidence seized from his car. The trial court denied defendant's motion to suppress. Defendant was convicted after a stipulated facts trial.

On appeal, defendant contended that the recorded telephone conversations between McEachern and himself should have been suppressed because McEachern's consent to the taping of the conversations was not voluntary. Defendant also contended that the evidence obtained as a result of the search of his vehicle was the "fruit of the illegal interception of telephone communications" between defendant and McEachern and also should have been suppressed.

In his petition for review to this court, defendant reasserts his grounds for reversal set forth above.

I.

Defendant argues that the recorded telephone communications between McEachern and himself were obtained through the involuntary consent of McEachern to the police's taping and that defendant's constitutional right to privacy under both the state and federal constitutions protects him from such an invasion.

Defendant asserts in his petition for review that:

> "The Oregon legislature developed a very clear line of authority in controlling this kind of law enforcement activity when it enacted ORS 133.721, *et seq.* and ORS 165.475 *et seq.* A specific prohibition is created in ORS 165.540 which prevents the obtaining or attempt to obtain, record, or listen to communications to which one is not a participant *unless consent is obtained* by at least one participant in the conversation. Subsection (7) of ORS 165.540 makes violation of this statute a crime." (Emphasis in original.)

and that:

> "The burden of proof is on the state under both the Oregon and federal constitutions and case law, to show that an individual's 'consent' to search, to wiretap, and/or to cooperate, was freely and voluntarily given. Oregon Constitution, Article I, sections 4, 8 and 11; U.S. Constitution, Fourth and Fourteenth Amendments * * *."

Thus, the issue boils down to whether the state has proven that McEachern voluntarily consented to the taping of the telephone conversations with defendant. No violation of a defendant's rights occurs if a telephone recording is made with the consent of one of the parties to the conversation. ORS 165.540(1)(a); *State v. Lissy,* 304 Or 455, 747 P2d 345 (1987).

■ This court has not addressed what is the proper standard for consent in the telecommunications context under ORS 165.540(1)(a). Under federal law, *United States v. Bonanno,* 487 F2d 654 (2d Cir 1973), is considered the leading case interpreting the consent issue when one party consents to recording a telephone conversation. Although certainly not binding precedent for this court in interpreting our statute, we discuss this case because most of Oregon's wiretap law was intended to mirror the federal wiretap legislation.[1] The

---

[1] The legislative history accompanying the state act relating to interception of communications, Or Laws 1979, ch 716, makes clear that the purpose of Senate Bill 484 (that became ch 716) was to conform Oregon law to federal law. *See* Minutes, Senate Committee on the Judiciary, Tape 60, Side 1 (June 25, 26, 1979). The legal counsel to the Judiciary Committee, Ms. Godwin, stated before the House committee that the Oregon wiretap statute preceding ORS 133.724 was repealed because it was not in compliance with federal law. Law enforcement officers had to use the federal statute standards because the federal statute was *stricter* than the Oregon law at that time. Senate Bill 484, according to Ms. Godwin, codifies the federal law. Minutes, House Committee on the Judiciary, Tape 103, Side 1, 1:30 p.m. session (June 30, 1979).

*Bonanno* court stated:

> "We observe at the outset that the extent of proof required to show that an informer consented to the monitoring or recording of a telephone call is normally quite different from that needed to show consent to a physical search whether by the defendant himself or by some person in a position to give an effective one. In cases involving physical search, the person alleged to have consented is doing something apparently contrary to his own interests or to those of another who often is in some way connected with him. An informer's consent to the monitoring or recording of a telephone conversation is an incident to a course of cooperation with law enforcement officials on which he has ordinarily decided some time previously and entails no unpleasant consequences to him. *Hence, it will normally suffice for the Government to show that the informer went ahead with a call after knowing what the law enforcement officers were about.*" 487 F2d at 658-59 (emphasis added; citations omitted).

Thus, under *Bonanno,* knowing participation in the telephone recording is sufficient; further evidence of consent is not necessary. In this case, there is no question that McEachern was a party to the conversation and knew that it was being recorded. This defendant has no valid claim of violation of any federal right.

■　We find the *Bonanno* "test" insufficient for application of ORS 165.540(1). Consent to cooperate with the police to record telephone conversations cannot be determined by such a shallow test that requires nothing about free will or lack of coercion, express or implied. We hold that our wiretap laws, which include "consent to telephone calls," require strict interpretation to protect the right of privacy as intended by the legislature in enacting the relevant portions of ORS chapters 133 and 165 and that the test for voluntary consent of telephonic recordations should be as set forth in other "consent" cases. Although used in a different context, those cases hold that the "proper test for voluntariness is to examine the totality of the facts and circumstances to see whether the consent was given by defendant's free will or was the result of coercion, express or implied." *State v. Wolfe,* 295 Or 567, 572, 669 P2d 320 (1983) (citing *State v. Kennedy,* 290 Or 493, 502, 624 P2d 99 (1981)).[2]

---

[2] In *Wolfe* the defendant's consent to a search was held to be involuntary where it

Defendant asserts:

"Here, the circumstances surrounding McEachern's arrest, interrogation and subsequent agreement to contact defendant Dimeo demonstrate the involuntary nature of his conduct. Upon his arrest, McEachern was read his rights and subsequently, the police began to question him. McEachern refused to consent to the search of his vehicle and only after continued pressure and asking mainly to speak to his attorney, McEachern reluctantly consented. He was transported to the police station and questioning began again. McEachern continued to assert his right to call a lawyer. Further, * * * McEachern was wet from standing out in the rain and only clothed in a shirt and pants. After continued questioning and asserting his right to an attorney, Officer Ed May interviewed McEachern and McEachern was told about the sentence he could expect if he failed to cooperate. Further, promises regarding a quick release from jail were made. It was only after continued questioning and implied threats of more severe treatment, that McEachern agreed to participate in the police plan to contact and set up a meeting with defendant Dimeo. * * *

"The police officers involved denied that McEachern continually asserted his right to have an attorney present, but concede that at some point he did invoke this right and that they spoke with him after he asserted his right. Further, Officer May admits to giving McEachern an ultimatum regarding cooperation. McEachern testified that he was told that if he talked to a lawyer, any deal would be off.

"* * * Officer Ed May does not deny speaking to McEachern after he had invoked his right to an attorney. Nor does May deny giving him an ultimatum regarding his cooperation. Thus, based upon the testimony of the officers, McEachern's consent to cooperate only came after hours of questioning in a small, cold room with no opportunity to speak to an attorney and the pressure of an uncertain future if a decision regarding cooperating was not made immediately.

---

came immediately after the police had obtained a confession in violation of defendant's Fifth Amendment rights. The court held that there were no intervening circumstances to show that the defendant had time to reflect on his best course of action after making *Miranda*-violative statements.

In *Kennedy* the historical facts indicated that the defendant's consent was voluntary because there was "an almost total absence of coercive factors," 290 Or at 504, where the defendant volunteered or invited a search after being approached by the officers, even though the initial "stop" was illegal.

"From the 3:45 p.m. arrest until 7:30 p.m. when the first call to defendant Dimeo was made, Mr. McEachern asserted his right to see an attorney and never saw or spoke to an attorney. * * *

"McEachern's consent came after hours of questioning, at least one, if not two or more requests, for an attorney, and implied threats of civil forfeiture and an extended prison sentence. These circumstances are precisely those which when viewed together show the consent to be the result of implied, if not expressed, coercion. Thus, the circumstances render the consent involuntary and the subsequent interception of communications unlawful and suppressible. * * *"

In spite of defendant's assertions, the trial court found that McEachern cooperated "freely and voluntarily" with the police and "did in fact consent to the tape recording of his telephone conversations with defendant Dimeo." In this case, McEachern's consent clearly would pass the test set forth in *Bonanno*. That is, McEachern knew that the police officer was recording the conversations with defendant, and he proceeded accordingly. The question in this state, however, must be whether the historical facts justify the trial court's finding that the state proved that McEachern's consent to allow police to record his telephone communications with defendant was voluntary and not impliedly or expressly coerced.

The trial court found that McEachern suffered from no mental or physical disability, was not under the influence of intoxicants, and had received no threats or promises from the police. Nevertheless the trial judge noted that a promise was made by the police officer, as well as noting that McEachern was first given a "facts-of-life" lecture, a threat that he would be booked and incarcerated, and an ultimatum that he must immediately decide whether to cooperate. We fail to perceive how this uncontested evidence could constitute other than a promise and a threat, coercing McEachern into consenting to cooperate. The trial court described the threat and promise as follows:

"(2)  After his arrest McEachern was taken to the Portland Police Bureau offices for an interview. While officer Virginia Wade was ostensibly in charge of the interview, the important verbal interplay was between Sergeant Edward May and McEachern. During the

interview May gave McEachern his 'facts of life talk'. This consisted of May explaining to McEachern that he was facing serious felony charges which carried the potential of a prison sentence or a fine; and, that McEachern could simply be booked, jailed and have his case processed or he could 'cooperate.' Cooperate meant to provide information to the police and assist in the investigation. May also explained to McEachern that if he was going to cooperate it was important for him to make a decision to do so immediately—that time was of the essence. May wanted to know who McEachern's source for cocaine was and he wanted McEachern's cooperation in contacting the source. For this cooperation May told McEachern that while he would still have to be booked and initially go to jail, and that while he still might go to prison, that he (May) would advise the District Attorney's office of the full extent of McEachern's cooperation. Within a period of about ten minutes McEachern made his decision to cooperate. He agreed to telephone his source of cocaine, to try and set up another purchase that evening and further agreed that his telephone conversations could be tape recorded. At this time McEachern was not under the influence of intoxicants, suffering from any mental or physical disability nor had any threats or promises been made to him by the police.

"(3) McEachern shortly thereafter had a series of telephone conversations with defendant Dimeo arranging a purchase of cocaine, which culminated in Dimeo's apprehension and arrest during the evening of November 27, 1984."

The trial court did not mention any denial of McEachern's request for an attorney, yet Officers Wade and May admitted that a request was voiced, but ignored.[3] Even though McEachern is not the defendant in this case and coerced evidence is not being offered against him, the refusal by the police to allow him to make an informed decision after advice

---

[3] The trial court commented:

"(4) McEachern's version of the conversation with Sergeant May differs from May's. The court finds, however that both Mr. McEachern and his domestic associate Vicki Andersen are less than credible witnesses as regards the events of November 27, 1984."

That statement does not affect the undisputed acts of the police officers or McEachern's request for an attorney.

from counsel certainly constitutes additional evidence that his ultimate decision to allow the police to tape record his conversations with defendant was involuntary.

This court is not blind to the obvious fact that deciding to act as a police informant carries substantial risk to the health and perhaps the life of the informant. That informants will cooperate with the police after consulting an attorney is aptly demonstrated by *State v. Lissy, supra,* where the telephone conversations were made at the informant's attorney's office and after the informant was carefully advised by her lawyer of her rights and risks.

Informants should not be subjected to high-pressure-sales tactics or be forced to make such important decisions immediately. As Justice Campbell noted in *State v. Wolfe, supra,* 295 Or at 573, the fact that a defendant had no opportunity to reflect on his best course of action after conversing with the police is important in determining consent. We believe that an informant, or a person situated in McEachern's position, should also be given an opportunity to reflect on his best course of action. If an attorney is requested, the opportunity to consult with an attorney must be honored. We are not holding that an attorney must be present or offered to an informant before the decision to cooperate is made. We do say that the failure to allow consultation weighs heavily in the determination as to whether the consent was voluntary.

In *Ball v. Gladden,* 250 Or 485, 487-88, 443 P2d 621 (1968), this court held that a trial court's findings should be upheld if the historical facts present are sufficient to justify the trial court's conclusions. In this case, although the trial court commendably set forth written findings, the ultimate conclusion of voluntary consent was inconsistent with the court's findings of historical facts. Further, the findings were insufficient, in that they failed to include or take into account the repeated requests by the informant to consult with an attorney before deciding to cooperate with the police by making the telephone calls.[4]

---

[4] To review trial court rulings on motions to suppress, appellate courts must have trial court findings of historical facts made either orally or in writing. In the absence of sufficient oral or written findings of historical facts, an appellate court may find it necessary to reverse trial court rulings. The phrase "historical facts" means nothing more or less than "what happened."

Based upon this record, we conclude that McEachern's consent to communicate with defendant by telephone was coerced and involuntary. Therefore, the motion to suppress the statements and the evidence obtained by the search warrant based upon those statements should have been allowed.

The decisions of the Court of Appeals and the trial court are reversed, and the case is remanded to the trial court for disposition consistent with this opinion.