Argued and submitted March 5, 1987, decisions of Court of Appeals and trial court reversed and remanded for trial February 17, 1988

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## RONALD ERVAN SPENCER,
*Petitioner on Review.*

(TC 85-60405; CA A38156; SC S33521)

750 P2d 147

Edmund J. Spinney, Springfield, argued the cause and filed petition on behalf of petitioner on review.

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause on behalf of respondent on review.

GILLETTE, J.

Linde, J., concurred and filed an opinion in which Peterson, C. J., and Lent, J., joined.

## GILLETTE, J.

This driving under the influence of intoxicants (DUII) case once again presents this court with the question of what consequences follow if evidence of an intoxilyzer result is obtained from an arrested DUII suspect after police have refused to allow that suspect to contact an attorney. The Court of Appeals, with one judge dissenting, held that evidence of the intoxilyzer result was admissible in spite of the fact that the suspect had been denied access to counsel. *State v. Spencer,* 82 Or App 358, 728 P2d 566 (1986). In so holding, the Court of Appeals majority relied on this court's plurality opinion in *State v. Newton,* 291 Or 788, 813, 636 P2d 393 (1981), which held that, although such a denial of access to counsel was an unauthorized restriction of the defendant's personal liberty in violation of the Fourteenth Amendment, the clarification of the law in that opinion should be "sufficient to cause a change in police practice and deter future similar conduct [by the police] without the necessity of creating a new exclusionary rule." We now conclude that the *Newton* approach may have been too optimistic and, in any event, was unworkable. We abandon that portion of *Newton* and, in so doing, reverse the Court of Appeals.

On May 4, 1985, Deputy McMullen of the Lane County Sheriff's Office arrested petitioner (hereafter defendant) for DUII. Defendant was transported to the Lane County Jail, where he was asked for a sample of his breath for testing. In connection with the request, McMullen explained to defendant the potential consequences of refusal to submit to the breath test. Defendant asked whether he could call his attorney before deciding whether to submit to the test. Defendant was told that he could not do so. He then submitted to the test. Defendant testified at the hearing on the motion to suppress that he had the name of an attorney and knew how to contact that attorney, had he been permitted to do so. The trial court ruled that the denial of an opportunity to consult counsel was not a sufficient ground to justify suppressing the intoxilyzer result.

The case reached the Court of Appeals on a state's appeal concerning another issue not important to the resolution of the present appeal. Defendant cross-appealed with respect to the denial of counsel issue. The Court of Appeals

ruled in favor of the state on all issues and remanded the case for trial. Defendant's present petition for review followed.

This case arises out of the implied consent law, which formerly was codified at ORS 487.805, *et seq,* and presently is codified at ORS 813.100, *et seq.* ORS 813.100 provides, in part:

"(1) Any person who operates a motor vehicle upon premises open to the public or the highways of this state shall be deemed to have given consent, subject to the implied consent law, to a chemical test of the person's breath for the purpose of determining the alcoholic content of the person's blood if the person is arrested for driving a motor vehicle while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance. A test shall be administered upon the request of a police officer having reasonable grounds to believe the person arrested to have been driving while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance. Before the test is administered the person requested to take the test shall be informed of consequences and rights as described under ORS 813.130.

"(2) No chemical test of the person's breath shall be given, under subsection (1) of this section, to a person under arrest for driving a motor vehicle while under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance, if the person refuses the request of a police officer to submit to the chemical test after the person has been informed of consequences and rights as described under ORS 813.130."[1]

---

[1] ORS 813.130 provides:

"This section establishes the requirements for information about rights and consequences for purposes of ORS 813.100 and 813.410. The following apply to the information about rights and consequences:

"(1) The information about rights and consequences shall be substantially in the form prepared by the Motor Vehicles Division. The division may establish any form it determines appropriate and convenient.

"(2) The information about rights and consequences shall be substantially as follows:

"(a) Driving under the influence of intoxicants is a crime in Oregon, and the person is subject to criminal penalties if the test shows that the person is under the influence of intoxicants. If the person refuses the test or fails, evidence of the refusal or failure may also be offered against the person.

"(b) The person will fail the test if the test shows that the person is under the influence of intoxicants under Oregon law.

"(c) If the person refuses or fails the test, the person's driving privileges will be suspended. The outcome of a criminal charge for driving under the influence of intoxicants will not affect the suspension. The suspension will be substantially

The issues presented are whether, under the statute quoted above or under the state or federal constitutions, an arrested driver has the right to call an attorney before deciding whether to submit to a breath test and, if such a right exists, the consequences that flow from a violation of that right. We have attempted to resolve those precise questions in two earlier cases: *State v. Scharf,* 288 Or 451, 605 P2d 690 (1980), and *State v. Newton, supra.* We turn first to a somewhat detailed examination of those two decisions.

I

In *State v. Scharf, supra,* as in this case, the defendant in a prosecution for DUII objected to the introduction of the results of a breathalyzer test administered after her request to consult an attorney was denied. This court held, by a 4-3 vote, that *former* ORS 487.540 required that an accused's

---

longer if the person refuses the test.

"(d)   If the person refuses or fails the test and has an Oregon driver license or permit, the license or permit will be taken immediately and, unless the person does not currently have full valid driving privileges, a temporary driving permit will be issued to the person.

"(e)   If the person refuses the test, the person will not be eligible for a hardship permit for at least 90 days, and possibly for one year, depending on the person's driving record. The person may possibly qualify for an occupational permit in 30 days if the person fails the test, depending on the person's driving record.

"(f)   After taking the test, the person will have a reasonable opportunity, upon request, for an additional chemical test for blood alcohol content to be performed at the person's own expense by a qualified individual of the person's choosing.

"(g)   The person has a right to a hearing to challenge the validity of the suspension before the suspension becomes effective. The person must make a written request to the Motor Vehicles Division for such a hearing. If the person wins at the hearing, the person's driving privileges will not be suspended. If the person loses at the hearing, the suspension will remain in effect during any court review of the hearing.

"(h)   The following times:

"(A)   If the person is issued a temporary driving permit under ORS 802.500, the number of hours before the driving permit will be effective and the number of days the permit will be effective.

"(B)   The number of days within which a person must request a hearing under ORS 813.410.

"(C)   The number of days within which a hearing under ORS 813.410 will be held.

"(3)   Nothing in this section prohibits the division from providing additional information concerning rights and consequences that the division considers convenient or appropriate."

decision to submit to a breath test be a "voluntary and informed choice." *State v. Scharf, supra,* 288 Or at 458. In so concluding, the majority noted that, under the statute, a police officer was to "request" that the accused submit to the test. If the accused objected, the officer was to explain the consequences of refusal and that the accused had the right to obtain a test on his or her own. The importance of these procedural requirements was underscored by the availability of a hearing on the license suspension and a *de novo* jury trial in circuit court, at which the accused could controvert the officer's report stating that the officer had provided the necessary advice of rights and consequences.

From the above portions of the implied consent statutes, the *Scharf* majority discerned a legislative intent that an accused be afforded the opportunity to make a "voluntary and informed choice" whether to submit to the breath test and risk a DUII conviction, or to refuse to submit at the price of a 120-day suspension. The majority noted that:

> "The legal consequences of the choice are neither obvious nor easy to evaluate in the individual case. Indeed these legal consequences change with the passage of new legislation * * *. There may be collateral effects for the individual's overall driving record, insurance coverage, even employment. Commonly an arrested person will know little of these implications of the decision to take or to refuse the test. But she may recognize, as [the defendant] did, that it is a decisive moment for the subsequent legal consequences and want to call counsel for advice before making the decision." *Id.* at 459 (footnote omitted).

The majority went on to conclude that the legislature could not have intended that an arrested driver would have to rely solely on the legal advice of the police in making the decision to take or to refuse the test. Exercise of the "voluntary and informed choice" contemplated by the legislature, in the majority's view, required that the arrested driver be given the opportunity to consult an attorney. *Id.* at 460. The majority then held that denial of access to counsel would result in suppression of the breath test results in a prosecution for DUII:

> "Because the legislature decided to employ breath tests in DUII prosecutions only with the suspect's informed assent, it follows that the results of such a breath test are to be used

against a DUII defendant only when they have been obtained by legally proper procedures." *Id.* at 460-61, citing *State v. Fogle,* 254 Or 268, 459 P2d 873 (1969).

Chief Justice Denecke dissented, joined by Justices Tongue and Howell. The dissent traced the history of the implied consent law, noting that, when breath tests first were authorized, they were strictly voluntary. In 1965, the Oregon legislature enacted a statute providing that a driver impliedly consented to a breath test by using the state's highways. At that time, a driver's refusal to submit resulted in license suspension, but the fact of refusal could not be admitted in the driver's criminal trial for DUII. In 1979, however, the legislature amended the statute to provide that a driver's refusal to take a breath test was admissible in a criminal prosecution. The dissent concluded:

> "The legislature has repeatedly evidenced serious concern about the problem of driving while under the influence of liquor. It has strengthened the enforcement of laws relating to driving while under the influence by amendments which changing constitutional law seemed to permit. In light of this history of repeated changes in the law in favor of stronger enforcement, I cannot read an implied legislative intent to require the opportunity for legal advice which certainly would not strengthen enforcement." *State v. Scharf, supra,* 288 Or at 463 (Denecke, C. J., dissenting).

The dissent went on to note that the statute in question expressly set out the information to be given a person who refuses the test, and concluded that:

> "In view of this express provision for the officer informing the arrested person of his or her choices and the consequences of the choices, I do not believe it reasonable to infer that the legislature also intended to legislate that the arrested person is entitled to additional advice from a lawyer." *Id.*

Finally, the dissent argued that the majority was wrong in holding that the statutory violation, assuming there was one, required the exclusion of the breath test results in the defendant's DUII trial. The statute under consideration required that the accused be informed of the consequences of refusal before the refusal could serve as a basis for administrative license suspension. *Former* ORS 487.805. In the dissent's view, this statute demonstrated the legislature's intent that failure to advise an arrestee of the consequences of refusal

would bar license suspension only. Taking that view one step further, the dissent noted:

> "[I]t does not appear reasonable to conclude that when the legislature expressly provides that the effect of an officer's failing to advise a person of his or her choices and their consequences is to prohibit the state from suspending his or her license, the legislature, nevertheless, intended that if one is prevented from obtaining a lawyer's advice the test results must be excluded from evidence." *State v. Scharf, supra,* 288 Or at 465-66.

Less than two years later, the court overruled the specific holding in *Scharf* that the results of a breath test must be suppressed under circumstances such as those presented in this case. *State v. Newton, supra.* While four members of that court (the three dissenting members and the specially concurring member) agreed that the actions of the officer in that case again violated the implied consent law, a majority of the court (the three plurality members and the specially concurring member) held that the denial of access to counsel did not require the suppression of evidence.

The *Newton* plurality specifically rejected the *Scharf* conclusion that denial of access to counsel violated the implied consent law. *State v. Newton, supra,* 291 Or at 800. The plurality began by exploring, as had the dissent in *Scharf,* the history and background of the implied consent statutes. Those statutes initially were enacted in response to caselaw, beginning with *Rochin v. California,* 342 US 165, 72 S Ct 205, 96 L Ed 183 (1952). There, the United States Supreme Court held that police conduct in obtaining morphine capsules swallowed by a criminal suspect offended the Due Process Clause of the Fourteenth Amendment to the United States Constitution:

> "Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation." 342 US at 172.

In response to *Rochin,* the New York legislature enacted the

prototypical implied consent statute in 1953. Instead of authorizing physical compulsion, which was thought to be prohibited by *Rochin,* the statute substituted an adverse legal consequence—the loss of driving privileges—to overcome resistance to blood alcohol tests.

The *Newton* plurality next traced the evolution of Oregon's implied consent law, noting, as had the dissent in *Scharf,* that the trend was toward increasing the statute's enforceability. This trend followed the action of the United States Supreme Court in sharply limiting the *Rochin* doctrine. *See Breithaupt v. Abram,* 352 US 432, 77 S Ct 408, 1 L Ed 2d 448 (1957)(blood sample taken from unconscious driver without consent did not violate the Fourteenth Amendment); *Schmerber v. California,* 384 US 757, 86 S Ct 1826, 16 L Ed 2d 908 (1966)(state could constitutionally compel a person to submit to blood test to determine blood alcohol content).

From the foregoing analysis, the *Newton* plurality concluded that the implied consent law was designed to imply a driver's legal consent to submit to a breath test, thereby removing the driver's right lawfully to refuse. The statute's reference to a "refusal" does not reinstate a driver's right to choose whether to submit to the test; rather, it recognizes the "physical reality" of a driver's ability physically to resist the test. *State v. Newton, supra,* 291 Or at 792-93. Thus, the implied consent law "is designed to overcome the possibility of physical resistance, despite legal consent, without resort to physical compulsion" by imposing adverse legal consequences on a refusal to submit to the test. *Id.* at 793. The plurality also noted that, under *former* ORS 487.805(2), an officer was required to inform the accused of the consequences of refusal only after an initial refusal to take the test, stating:

> "Had the legislature been concerned 'with assuring the arrested driver a voluntary and informed choice' as we stated in *Scharf,* 288 Or at 459, it surely would have required the police to advise the driver *before,* not *after,* the driver first chooses to submit or refuse." *Id.* at 799 (emphasis in original).

The plurality concluded that the legislature did not intend an arrested driver to have *any* choice whether to submit to the breath test, and that access to counsel before taking the test was not required by *former* ORS 487.805.

Having found no statutory violation, the plurality

went on to discuss the defendant's constitutional claims. It first concluded that the warrantless seizure of a breath sample from the defendant did not violate the Fourth Amendment of the United States Constitution or Article I, section 9, of the Oregon Constitution, because the police had probable cause to believe that the sample would yield evidence of intoxication and because the likelihood that the evidence would dissipate in a short period of time created exigent circumstances justifying a warrantless seizure. That the defendant was not afforded an opportunity to consult a lawyer first did not invalidate the seizure under either the Fourth Amendment or Article I, section 9, because neither provision gave the defendant the right to refuse and a lawyer could not have advised him otherwise. *State v. Newton, supra,* 291 Or at 801-2.

The plurality also found no violation of state or federal guarantees of the right to counsel. Because the defendant had not yet been charged with a crime, the plurality concluded that no right to counsel under the Sixth Amendment or Article I, section 11, had attached at the time of the breath test. *Id.* at 803-04.

Finally, the plurality ruled that an arrestee's right to call an attorney is a liberty interest protected by the Fourteenth Amendment and that the officer's conduct was an unauthorized restriction of that liberty interest:

"The opportunity of an arrested person to promptly communicate beyond confinement is not necessarily of the same magnitude of liberty as marital and procreational privacy which the United States Supreme Court held could only be restricted for 'compelling' public interests * * *. Neither, however, is it a minimal thing beneath the notice of the law. The everyday freedom to communicate with others takes on greater importance when one is in the enforced isolation of police custody. Communication may be the means to security [sic] release, advice, reassurance of one's family or associates, or professional assistance. For at least these reasons, allowance of a telephone call following arrest has become traditional and incommunicado incarceration is regarded as inconsistent with American notions of ordered liberty. Freedom of an arrested person to communicate is a significant and substantial liberty which may only be officially restricted if there is legal authority to do so." *Id.* at 807 (citation omitted).

The police officer's actions in *Newton* had interfered

with this liberty interest. The plurality nevertheless concluded that suppression of the breathalyzer results in the defendant's DUII prosecution was not warranted for two reasons. First, the record did not establish a causal relationship between the denial of access to counsel and the obtaining of the breath sample. *Id.* at 809. Second, the plurality felt that its opinion would clear up the "good faith misunderstanding of the law" held by the police and deter future similar conduct without the creation and application of a new exclusionary rule. *Id.* at 813.

In a specially concurring opinion, Justice Tongue wrote that, although he agreed that an arrested person had a right to call an attorney, he was "not prepared to hold at this time that such a right is a constitutional 'liberty' under the Fourteenth Amendment." *State v. Newton, supra,* 291 Or at 813 (Tongue, J., specially concurring). Justice Tongue agreed with that part of *Scharf* which held that the denial of access to counsel violated the implied consent law. However, he would not have excluded the breathalyzer results on that ground, absent clear legislative intent that a violation of that law would render the test results invalid.

Justice Linde, joined by Justices Peterson and Lent, dissented, arguing that the plurality should have adhered to the *Scharf* court's holding that the implied consent law gave an arrested driver the right to consult a lawyer before deciding whether to submit to a breath test. The plurality's resolution of the case, Justice Linde argued, "needlessly enmeshes the [implied consent] law in serious constitutional difficulties." *State v. Newton, supra,* 291 Or at 818 (Linde, J., dissenting).

After reiterating the interpretation of the implied consent law set out in *Scharf,* the dissent turned to a criticism of the plurality's constitutional analysis. First, the dissent argued, the plurality should not have based its decision on the federal constitution; that it did suggested that the defendant would have no protection under Oregon law. Second, the plurality opinion was not "a serious attempt to discern and to follow the federal law," because it was not based on an analysis of relevant federal caselaw. *State v. Newton, supra,* 291 Or at 823 (Linde, J., dissenting). Third, Justice Linde wrote, "after finding a violation of due process of law, the plurality opinion incongruously holds that a conviction resulting from

that violation nevertheless will not deprive Mr. Newton of liberty without due process of law." *Id.* at 823. That result would leave a person in the defendant's position without any legal remedy for the violation of a constitutional right.

Justice Lent joined in Justice Linde's dissent, but also wrote separately to point out that, after *Scharf* was decided, the legislature considered and rejected an amendment to the implied consent law that would have changed the result reached in that case. In his view, the legislature's failure to overrule *Scharf* supported the validity of that case's interpretation of the statute. *State v. Newton, supra,* 291 Or at 815-18 (Lent, J., dissenting).

II

The present case presents a classic fact pattern very much in the tradition of *Scharf* and *Newton.* The proper approach in evaluating defendant's claim is to consider first whether the state's action violated Oregon statutory law, then to consider the claim under the Oregon Constitution and, finally, under the federal constitution. *See, e.g., Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 98 n 1, 570 P2d 52 (1977).

As Justice Lent pointed out in his dissenting opinion in *Newton,* this court's interpretation of a statute becomes a part of the statute and should be changed only by the legislature. *State v. Newton, supra,* 291 Or at 815; *see also State v. Elliott,* 204 Or 460, 465, 277 P2d 754 (1954), *cert den,* 349 US 929 (1955). Had *Newton* not been decided, we might not undertake to change the *Scharf* rule now. Less than two years after *Scharf* was decided, however, a majority of the *Newton* court concluded that the interpretation set out in *Scharf* was wrong—three members rejected the entire exercise in statutory construction; one could not find any legislative intent to suppress evidence. The decision in *Newton* cast sufficient doubt on the meaning of the implied consent law that we feel it is proper to reexamine the question.

The basic concept embodied in the implied consent law is that one who drives a motor vehicle on the state's highways impliedly consents to a breath test. ORS 813.100(1). The view of the implied consent law set out in *Scharf*—that a driver nevertheless legally may withhold consent when asked

to take the test—is somewhat at odds with that basic concept. We agree with the *Newton* plurality that the statute's references to a driver's "refusal" do not evince a legislative concern that the driver make a voluntary and fully informed decision whether to submit to the test. Consent being implied by law, a driver may not legally refuse. A driver, however, can *physically* refuse to submit, and the implied consent law, recognizing that practical reality, forbids the use of physical force to compel submission.[2] The history and development of the implied consent law, as outlined by the dissent in *Scharf* and by the plurality in *Newton,* suggest that the advice to be given an arrestee was intended to provide an additional incentive, short of physical compulsion, to induce submission.[3] Moreover, while the implied consent law sets out in detail the advice to be given a driver before a breath test may be administered, ORS 813.130, there is no express provision for advising the driver that he or she may contact an attorney. In view of the background and purpose of the statutes at issue here, we cannot

---

[2] This interpretation of the implied consent law is reinforced by the legislature's express distinction between a person's "refusal to consent" to other kinds of chemical tests, *see* ORS 813.140, and a person's "refusal to submit" to a breath test, *see* 813.100(2). *See also* ORS 813.310, which provides:

"If a person *refuses to submit* to a chemical test under ORS 813.100 or *refuses to consent* to chemical tests under ORS 813.140, evidence of the person's refusal is admissible in any civil or criminal action, suit or proceeding arising out of acts alleged to have been committed while the person was driving a motor vehicle on premises open to the public or the highways while under the influence of intoxicants." (Emphasis added.)

[3] The *Newton* plurality read *former* ORS 487.805(2) as requiring that advice be given only after the driver's initial refusal to submit to a breath test. *State v. Newton,* 291 Or 788, 799, 636 P 2d 393 (1981). At the time that *Newton* was decided, *former* ORS 487.805(2) provided:

"No chemical test of the person's breath shall be given, under subsection (1) of this section, to a person under arrest for driving a motor vehicle while under the influence of intoxicants in violation of ORS 487.540 or of a municipal ordinance, if the person refuses the request of a police officer to submit to the chemical test after the person has been informed of:

"(a) The consequences of a refusal under ORS 482.540 to 482.560 and this section; and

"(b) The person's rights under ORS 487.810."

The statute is ambiguous as to whether advice of rights and consequences must be given before the driver's initial decision. In 1985, the legislature amended ORS 813.100 to provide that the advice be given before a breath test is administered. Or Laws 1985, ch 16, § 298; ch 672, § 19. The legislative history indicates that no substantive change was intended.

infer any legislative intent that a driver's decision physically to refuse the test be made with the advice of a lawyer.

As the dissent in *Scharf* also pointed out, the legislature provided that, if an arrested driver is not adequately advised, a refusal to submit to a breath test cannot serve as a basis for license suspension. ORS 813.410. The legislature has provided in detail the advice to be given and the consequences of failure to advise. We decline to find, as the *Scharf* court appeared to suggest, that the legislature intended to afford an arrested driver an additional, though unexpressed, right with an additional, also unexpressed, penalty for violation of that right. We also decline to hold, as the concurring opinion in the present case would have it, that the officer's actions were unlawful because no statute affirmatively authorized them.

We conclude that the implied consent law, ORS 813.100, *et seq*, does not require that a driver be given access to counsel before submitting to a breathalyzer exam. We turn to defendant's claims under the Oregon Constitution.

### III

■ The *Newton* plurality rejected the argument that Oregon's right to counsel provision, Article I, section 11, prohibits the denial of access to counsel before a suspect undergoes a breathalyzer exam. The plurality first discussed the right to counsel under the federal constitution and concluded that the breathalyzer exam was not a "critical stage" in a criminal prosecution that would trigger protection under the Sixth Amendment because, when the breath test was administered, the defendant had not yet been formally charged. *See Kirby v. Illinois,* 406 US 682, 92 S Ct 1877, 32 L Ed 2d 411 (1972); *Gilbert v. California,* 388 US 263, 87 S Ct 1951, 18 L Ed 2d 1178 (1967); *United States v. Wade,* 388 US 218, 87 S Ct 1926, 18 L Ed 2d 1149 (1967). The plurality then turned to the state constitutional question.

Article I, section 11, of the Oregon Constitution, provides in pertinent part:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel * * *."

The *Newton* plurality noted that:

"It is arguable that we should adopt an earlier point, *e.g.,*

the arrest, by which to define the commencement of 'all prosecutions' as that term is used in Article I, section 11, of the Oregon Constitution, but we conclude that the formal charge is the legal event which commences the obligation of the state to provide counsel. Functionally, there are no legal procedures for the appointment of counsel for indigents prior to a formal charge being brought and, as we observed in *Scharf,* 288 Or at 456 n 4, the decision to commence criminal rather than administrative proceedings is commonly not made until after a breathalyzer test is refused or taken and the result known. * * * Hence, under Article I, section 11, we concur in the reasoning of *Kirby* that the right to counsel 'in all criminal prosecutions' includes critical stages of the prosecution subsequent to indictment or other formal charge." *State v. Newton, supra,* 291 Or at 804-05 (citation omitted).

As the *Newton* plurality recognized, the key to the applicability of Article I, section 11, lies in the meaning of the term "criminal prosecutions." We have, in the past, given that term an expansive interpretation. For example, we have held that the rights guaranteed under Article I, section 11, apply to prosecutions for misdemeanors as well as felonies. *State ex rel Ricco v. Biggs,* 198 Or 413, 430, 255 P2d 1055 (1953). Those rights also apply to all offenses that have the character of criminal prosecutions, whether or not they are statutorily labeled crimes. *Brown v. Multnomah County Dist. Ct., supra,* 280 Or at 98. Moreover, a "criminal prosecution" does not end with the verdict; it extends to a presentence psychiatric interview. *State ex rel Russell v. Jones,* 293 Or 312, 647 P2d 904 (1982). *See also id.* at 321 (Lent, J., concurring)("[t]he right of an accused under Article I, section 11, to be heard by himself or counsel, * * * is guaranteed in 'all criminal prosecutions,' not limited to 'critical stages' of such prosecutions").

Before *Newton,* our caselaw interpreting Article I, section 11, did not define the point at which a "criminal prosecution" begins. In the later case of *State v. Sparklin,* 296 Or 85, 92 n 9, 672 P2d 1182 (1983), we left open the question whether the right to counsel under Article I, section 11, "attaches" before the filing of a formal charge. We noted, however, that:

"There can be no question that the right to an attorney during the investigative stage is at least as important as the right to counsel during the trial itself. Where once the primary confrontation between state and individual occurred at the

trial, now 'the point at which the individual first confronts the amassed power of the state has moved back in the process from trial to the police stage.' " *Id.,* quoting Note, *An Historical Argument for the Right to Counsel During Police Interrogation,* 73 Yale LJ 1000, 1041 (1964).

We are not persuaded by the *Newton* plurality's reasons for concluding that the right to seek the advice or assistance of counsel under Article I, section 11, attaches only after a formal charge is filed. That opinion blurred the distinction between a person's right to have reasonable access to legal advice with the state's obligation to provide an indigent suspect with an attorney at the state's expense. It may be that both the *Newton* plurality and *Scharf* majority, in referring to the problem of appointing counsel to represent indigent defendants, feared that any expansion of the scope of Article I, section II, would place the state in the position of being required under the Equal Protection Clause to have appointed counsel available at every place where an intoxilyzer was to be used. In view of the exigencies attendant to the breath test process and the extraordinary expense such an approach would entail, we doubt that the Supreme Court would take the dictates of *Gideon v. Wainwright,* 372 US 335, 83 S Ct 792, 9 L Ed 2d 799 (1963), and its progeny that far. *See, e.g., State v. Horine,* 64 Or App 532, 669 P2d 797, *rev den* 296 Or 237 (1983), *cert dismissed* 466 US 934, 104 S Ct 1932, 80 L Ed 2d 477 (1984).

A person taken into formal custody by the police on a potentially criminal charge is confronted with the full legal power of the state, regardless of whether a formal charge has been filed. Where such custody is complete, neither the lack of a selected charge nor the possibility that the police will think better of the entire matter changes the fact that the arrested person is, at that moment, ensnared in a "criminal prosecution." The evanescent nature of the evidence the police seek to obtain may justify substantially limiting the time in which the person may exercise his or her Article I, section 11, right, but it does not justify doing away with it.

We hold that, under the right to counsel clause in Article I, section 11, an arrested driver has the right upon request to a reasonable opportunity to obtain legal advice

before deciding whether to submit to a breath test.[4] Because evidence of an arrested driver's blood alcohol dissipates over time, the state is not required to wait for a long period of time before administering the test. As both *Scharf* and *Newton* recognized, however, permitting the arrested driver to attempt to contact an attorney does not necessarily result in the loss of evidence. There is no suggestion in this case that that would have occurred.[5]

## IV

■ We turn to the appropriate consequence to be imposed for violation of this right. As previously noted, the *Newton* plurality's conclusion that an exclusionary rule was unnecessary has proven entirely unworkable. We have no way of learning—whether through some sort of judicial notice or otherwise—how thoroughly to heart the authorities have taken the respite given them in *Newton*. A rule that implies a capacity for empirical review is useless, where the review is impracticable. We decline to extend this approach to our Oregon constitutional analysis.

The second ground for the plurality's refusal to suppress the breath test results was that the defendant failed to demonstrate a sufficient causal relationship between the denial of access to counsel and obtaining the breath sample. The *Newton* plurality would have required the defendant to demonstrate that, had he been permitted to use the telephone, he would have obtained and followed legal advice that he not take the test. *State v. Newton, supra,* 291 Or at 809-10. The plurality explained that requirement as follows:

> "The request [to call an attorney] alone may be sufficient in a Fifth Amendment or Sixth Amendment context, * * * but here we are considering only a restriction of liberty, not a denial of rights." *Id.* at 810 n 11.

In the present decision, however, we do not rely on

---

[4] We express no opinion on the *Newton* plurality's conclusion that the denial of access to an attorney violated the Fourteenth Amendment. Because our disposition rests on state constitutional law, it is unnecessary to consider defendant's claim under the federal constitution.

[5] Although no absolute line can be drawn, because the number of attending circumstances can vary so greatly, we note that a period of 15 minutes after the request to take the test has been made will doubtless suffice in most cases.

the *Newton* "restriction of liberty" theory, but on the denial of defendant's right to counsel under the Oregon Constitution. We hold that defendant demonstrated an adequate causal relationship—if any need be shown—by testifying that he requested an opportunity to call his attorney and that he "would have liked to have had" that attorney's advice before deciding whether to take the breath test. We will not speculate as to what advice would have been given in this case, nor about what defendant's decision would have been in response to that advice. *Cf. State v. Haynes,* 288 Or 59, 75, 602 P2d 272 (1979), *cert den* 446 US 945 (1980)(where police prevented counsel retained on the defendant's behalf to communicate with the defendant, in violation of Article I, section 12, the court would not speculate as to whether the defendant would have waived his right to have counsel present at interrogation had he known that counsel was available). The violation of defendant's right to counsel in this case requires exclusion of the breath test results.

The decision of the Court of Appeals is reversed. The decision of the trial court is reversed, and the case is remanded for trial.

**LINDE, J.,** concurring.

Justice Gillette's majority opinion sets out the reasons that led a majority of this court in *State v. Scharf,* 288 Or 451, 605 P2d 690 (1980), to hold that the state could not prosecute a defendant for driving under the influence of intoxicants with the use of evidence of breathalyzer results obtained after police officers denied the driver's request to consult a lawyer. The reasons were that the applicable statutes left the driver a choice whether to take the breathalyzer test or to refuse to take it at the cost of losing her driver's license, that nothing in the statute purported to authorize interference with the "long established and well-known right of any arrested person to call an attorney," 288 Or at 460, and that constitutional holdings could wait until the legislature attempted to permit such interference. 288 Or at 462.

The sequels confirm rather than undermine the correctness of our original approach in *Scharf.* In *State v. Newton,* 291 Or 788, 636 P2d 393 (1981), the plurality opinion disregarded this court's usual rule of *stare decisis* for statutory interpretations, *see id.* at 815 (Lent, J., dissenting), and after

rejecting a basis for the right to call one's lawyer in Article I, section 11, of the Oregon Constitution, embarked on a search for a federal basis in the Fourteenth Amendment. Today's majority in turn discards that approach in favor of the state constitutional premise rejected in *Newton.* That premise may well be available, but it is not beyond debate, as *Newton* shows, and it is unnecessary.

The majority opinion makes the court's task too difficult when it reports (305 Or at 72) that "the implied consent law, ORS 813.100 *et seq,* does not require that a driver be given access to counsel before submitting to a breathalyzer exam." The question is not whether a statute "requires" that the state's officials allow a person to call a lawyer. The legislature does not have to put that kind of thing into a statute. The question, rather, is whether anything in the statute allows the state's officials to *deny* access to counsel under circumstances when practical exigencies do not stand in the way of the delay that a telephone call would represent.[1] The court found no such authority to deny access to counsel in *Scharf* eight years ago, and the legislature has not added it since then. I therefore concur on the grounds on which I previously dissented in *State v. Newton, supra.*

Peterson, C. J., and Lent, J., join in this opinion.

---

[1] *Cf. State v. Dimeo,* 304 Or 469, 477-78, 747 P2d 353 (1987) (denial of prisoner's right to call lawyer invalidated use of his telephone conversation with defendant as evidence against defendant).