STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JEREMY MICHAEL HAYES,
*Defendant-Appellant.*

Jackson County Circuit Court
093367FE; A148649

353 P3d 1237

Brian Michaels argued the cause and filed the briefs for appellant.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Christina M. Hutchins, Senior Assistant Attorney General.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.*

_____

* Haselton, C. J., *vice* Wollheim, S. J.

DUNCAN, P. J.

## DUNCAN, P. J.

In this criminal case, defendant challenges the trial court's partial denial of his motion to suppress evidence obtained as a result of his consent to a search of his house and yard.[1] As he did in the trial court, defendant argues that the state failed to prove that his consent was voluntary. For the reasons explained below, we affirm.

We review a trial court's ruling on a motion to suppress for errors of law, and we are bound by the trial court's findings of fact, provided they are supported by constitutionally sufficient evidence. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). If the trial court did not make findings on particular issues and there is conflicting evidence in the record, "we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *Id.* (citation omitted).

After being charged with several drug crimes,[2] defendant filed a motion to suppress evidence police officers obtained as a result of their search of his house and yard. The officers did not have a warrant to conduct the search; they acted pursuant to defendant's consent. In the motion, defendant asserted that, when the officers asked him if he would consent to a search of his house and yard, he refused and said that he wanted to speak with an attorney, but the officers continued to ask him for consent, and, therefore, his subsequent written consent was "the result of officers overcoming his will[.]"[3] At the hearing on the motion, defendant also asserted that his consent was involuntary because, before he consented, the officers had stopped him without

---

[1] As explained below, the trial court concluded that defendant gave voluntary consent to a search of his house and yard, but that defendant later revoked that consent. 272 Or App at 6-7. The trial court denied defendant's motion with respect to the evidence seized before defendant revoked his consent, but granted it with respect to the evidence seized after he revoked it.

[2] The state charged defendant by indictment with unlawful manufacture of marijuana, *former* ORS 475.840 (2009), *renumbered as* ORS 475.752 (2011); unlawful delivery of marijuana, ORS 475.860; unlawful possession of marijuana, ORS 475.864; and criminal forfeiture, ORS 131.582.

[3] In the trial court, defendant also argued that the police told him that they could obtain a search warrant, but that statement was "unfounded" because, according to defendant, the police did not have probable cause to search his house. Defendant does not renew that argument on appeal, and we do not address it.

reasonable suspicion by seizing his cell phone, "[s]o at that point any consent is inadmissible."

The trial court issued a written order denying the motion. In the order, the court set out its findings of fact and conclusions of law. Stated in accordance with the trial court's order, the relevant facts are as follows.

On the day of the challenged search, officers stopped a car driven by a man, Charlan. The car contained five pounds of marijuana and five pounds of hashish. Charlan told the officers that he was going to deliver the drugs to defendant in exchange for $20,000. Charlan also told the officers that he made his arrangements with defendant through another man, Alderete, who sold drugs for defendant.

At the officers' request, Charlan called Alderete to try to get either Alderete or defendant to make the exchange in public. Alderete told Charlan to bring the drugs to defendant's house. The officers then moved Charlan's car to a mall and had Charlan call Alderete and pretend that the car had broken down at the mall. Charlan did, and he told Alderete that he wanted Alderete to come to the mall with part of the money due and then take the drugs to defendant's house.

Alderete arrived at the mall, driving a car registered to defendant. After Charlan indicated that the drugs were in the trunk of his car, Charlan and Alderete walked to the trunk. At that point, the officers contacted Alderete, who had $200 on his person.[4]

Four officers went to defendant's house, arriving around 5:00 p.m. To prevent Alderete from warning defendant that they were coming, the officers brought Alderete with them. The four officers went to defendant's front door, leaving Alderete in a car with a fifth officer. The four officers intended to do a "knock and talk" to see if defendant would consent to a search of his house. The officers knew that defendant was authorized to grow marijuana under the Oregon Medical Marijuana Act (OMMA).

---

[4] The trial court's written opinion states that Alderete had $300 on his person for the drug buy, but the only evidence in the record on that matter is that Alderete had $200.

Defendant has security cameras that face the front and back of his house. A video recording of the encounter between defendant and the officers was introduced into evidence, but it has no audio. The trial court found that the "overall atmosphere" of the encounter was "cordial and low key."

When the officers knocked on his door, defendant answered. He asked to secure his dogs and went inside the house for a few minutes. He then returned to the front door and stepped outside. The officers told defendant about what they had learned from Charlan. They also told him that they knew he had a permit to grow marijuana under the OMMA. Defendant initially offered to allow the officers to see his marijuana grow. But when the officers explained that they wanted to conduct a more general search of the premises in light of what Charlan had told them, defendant said that he wanted to speak to an attorney about whether to consent. In response, one of the officers, Hatten, told defendant that defendant did not have to allow the officers into his house, but that if defendant did not, Hatten would apply for a search warrant and that, "until that search warrant is either denied or granted, no one's going to go in or out of the house." Defendant's friend, Gomez, was inside the house, as was defendant's father, who was very ill.[5] Defendant told the officers about Gomez and his father.

The trial court found that, for 20 minutes after defendant said he wanted to speak with an attorney, "defendant and the officers engaged in a low key and amiable conversation" and "[t]he conversation did not include any further questioning of defendant." During that time period, Hatten read defendant his Miranda rights and another officer, Schwab, seized defendant's cell phone.

While defendant and the officers were talking, Gomez came out of the house. She told defendant not to consent. At another point, Alderete walked toward the house, and the officers told him to leave.

---

[5] Defendant's father had multiple medical problems. He had recently had surgery to remove his colon and had a colostomy bag. He also was attached to a dialysis machine.

Hatten testified that his conversation with defendant was "just a normal conversation" and that he did not question defendant after defendant said that he wanted to speak with an attorney. Similarly, another officer, Schwab testified that, "[a]fter [defendant] asked for the attorney, [the officers] didn't ask [for] consent again."

A third officer, Proulx, testified about the content of the officers' conversation with defendant after defendant said that he wanted to speak with an attorney:

> "[Defendant] tried to engage us in conversation numerous times, and we repeatedly told him, look, you asked for an attorney, we can't talk to you. And we explained that, you know, you asked for it, so we cannot—we can't even talk to you about anything any more. And then * * * after a period of time * * * [defendant] asked if he could recant his request for an attorney, and allow us to—to search his house, his residence. And we told him that, you know, he could do that, and before we did anything, [another one of the officers] * * * came up with [a waiver] that I actually put in my notebook, and * * * [defendant] signed my notebook[.]"[6]

The officers then entered and searched defendant's house and yard. One of the officers discovered a container of marijuana and cash in the yard.

After the officers had searched for one half of an hour, defendant saw that his father was out of bed and doubled over on the back deck. Defendant told the officers to leave, but they continued to search.[7]

The trial court concluded that, when Schwab seized defendant's cell phone, Schwab "convert[ed] the nature of the contact from a conversation to a stop[,]" but "the stop was

---

[6] The waiver states, "I, Jeremy Michael Hayes freely and without corecion [sic] or promises of lineancy [sic] related to criminal charges recant my request for an attorney." Defendant signed under the waiver.

[7] In its order, the trial court stated that all of the officers who testified denied that defendant revoked his consent to the search, but that

> "[d]efendant's body language noted on the video of the encounter on defendant's back deck, combined with defendant's testimony that he told the officers that 'you asked for a half an hour' in recanting his consent, and the fact that the defendant's father appears on the back deck, doubled over, approximately one half hour after the search began, leads the Court to conclude that the defendant did rescind his consent to the officers' search at the point where defendant's father appeared on the back deck."

justified by the reasonable suspicion that the officers then had, based on all the circumstances that led to their presence at defendant's home." The trial court further concluded that, after the stop, defendant "recanted [his statement that he wanted to speak with an attorney], while aware of the right that he was abandoning"; thus, the officers could search defendant's house and yard pursuant to defendant's consent, until defendant revoked it. Accordingly, the trial court ruled that the evidence obtained before defendant revoked his consent was admissible, but the evidence they obtained after he revoked his consent was not.

After the trial court's ruling, defendant entered a conditional guilty plea to the charge of unlawful possession of marijuana, reserving his right to appeal the trial court's ruling. The state dismissed the remaining charges.

On appeal, defendant challenges the trial court's partial denial of his motion to suppress, arguing, as he did in the trial court, that his consent was not voluntary. He raises two assignments of error, which we address in turn.

Defendant's first assignment of error relates to his claim that his consent was not voluntary because the officers did not honor his request to speak with an attorney. Defendant argues that the officers engaged in a "continued effort * * * to overcome [his] refusal to consent, even after he requested to speak with his attorney on the question of whether or not to consent." In support of his argument, defendant cites *State v. Dimeo*, 304 Or 469, 478, 747 P2d 353 (1987), in which the court observed that, when officers ask a person for consent and, in response, the person asks to speak with an attorney, the officers' subsequent "failure to allow consultation weighs heavily in the determination as to whether the consent was voluntary."[8]

---

[8] In *Dimeo*, the issue was whether an informant's consent to participate in recorded telephone calls with the defendant was voluntary. The informant had been arrested for drug crimes and officers asked him to cooperate by providing information about his supplier and making recorded calls to arrange a drug buy from the supplier. The informant repeatedly asked to see an attorney before deciding whether to cooperate, but the officers ignored his requests. The officers also told the informant that, if he cooperated, the district attorney would be told, but if he did not cooperate, he would be booked and jailed. In addition, the officers gave the informant an ultimatum, telling him that he needed to immediately

Defendant's argument is unavailing because it is premised on a factual assertion that is inconsistent with the trial court's explicit and implicit findings. Defendant asserts that, after he said that he wanted to speak with an attorney, the officers "repeatedly prodded" him to consent. But the trial court found that, after defendant said he wanted to speak with an attorney, defendant and the officers "engaged in a low key and amiable conversation" and that "[t]he conversation did not include any further questioning of defendant." Those findings indicate that the trial court found that, after defendant said that he wanted to speak to an attorney, the officers did not ask defendant any questions, including whether he would consent to a search. And, that finding is supported by evidence in the record. As set out above, Hatten testified that he did not question defendant after defendant said that he wanted to speak with an attorney, and Schwab testified that the officers did not ask defendant for consent after defendant said that he wanted to speak with an attorney.

Defendant appears to take issue with the officers' testimony. He points out that both he and Gomez testified that the officers continued to press him for consent after he said that he wanted to speak with an attorney, and he contends that their testimony was corroborated by Hatten, who testified that the officers were "trying to get verbal consent" when Gomez was outside, which, defendant contends, was after he said that he wanted to speak with an attorney.[9]

Given our standard of review, defendant's fact-based argument provides no basis for reversal. Because there is

decide whether to cooperate. *Dimeo*, 304 Or at 471-76. Considering the "totality of the facts and circumstances to see whether the consent was given by defendant's free will or was the result of coercion, express or implied[,]" the court concluded that the "historical facts" did not justify the trial court's conclusion that the informant's consent was voluntary. *Id.* at 474, 476, 479.

[9] Hatten testified that he believed that Gomez came outside before defendant said he wanted to speak with an attorney. Defendant disputes that, and, at trial, two officers—who were shown relevant portions of the videotape as they testified—agreed that defendant said he wanted an attorney before Gomez came outside. Thus, defendant's position is that Hatten's testimony should be accepted with respect to his statement that the officers tried to get defendant's consent after Gomez came outside, but should not be accepted with respect to his statement that defendant did not say he wanted an attorney until after Gomez came outside.

evidence from which the facts could be decided in more than one way, we are required to presume that the trial court decided the facts in a manner consistent with its ultimate conclusion; therefore, we must reject the factual premise of defendant's argument that the police overbore his will by repeatedly requesting consent after he said that he wanted to speak with an attorney.

Defendant's second assignment of error relates to his claim that his consent was not voluntary because the officers illegally seized him before he consented by stopping him without reasonable suspicion.[10] As mentioned, the trial court concluded that Schwab's seizure of defendant's cell phone converted the officers' encounter with defendant into a stop, which had to be justified by reasonable suspicion.[11] Thus, the issue is whether the officers had reasonable suspicion that defendant had committed a crime when Schwab took defendant's cell phone. *See State v. Holdorf,* 355 Or 812, 823, 333 P3d 982 (2014) (to have reasonable suspicion to stop a person, an officer must have a subjective belief, based on specific and articulable facts, that the person has committed or is about to commit a crime, and that belief must be objectively reasonable). We conclude that they did because, at that point, they knew that Charlan, who was carrying five pounds of marijuana and five pounds of hashish, had stated that he was going to deliver the drugs to defendant's house and, when Charlan called Alderete in an attempt to get either defendant or Alderete to make the exchange in public, Alderete told Charlan to bring the drugs to defendant's house. Then, when Charlan falsely told Alderete that his car had broken down at the mall, Alderete came to the mall,

---

[10] Defendant's argument relates only to the seizure of his person and whether the officers had reasonable suspicion to support that seizure. He does not argue that, even if the officers had reasonable suspicion to stop him, they unreasonably extended the duration of the stop.

In addition, defendant does not argue that the officers seized his cell phone and house without probable cause. Nor does he argue that the totality of the circumstances—including the number of officers, the officers' exercise of control over defendant's house (where defendant's ailing father was), the officers' seizure of defendant's cell phone after defendant said he wanted to speak with an attorney, and the officers' exclusion of Alderete from defendant's property—rendered his consent involuntary.

[11] The state does not dispute that Schwab's seizure of defendant's phone converted the encounter into a stop.

driving a car registered to defendant. Based on Charlan and Alderete's statements and defendant's connection to Alderete, which was corroborated by the fact that Alderete drove defendant's car to the mall, the police had reasonable suspicion to stop defendant to inquire about whether he was involved in the purchase of the drugs.

Defendant contends that the police did not have reasonable suspicion to stop defendant because, although Charlan told Alderete that the drug buy would have to take place at the mall, Alderete had only $200 on his person when he came to the mall. Defendant suggests that that fact compels a conclusion that "there was no reason to reasonably suspect [defendant] of any criminal activity; only that Alderete went to the mall to assist some people whose car had broken down." We disagree. Given that Charlan had asked Alderete to come to the mall for a drug buy, it was reasonable for the officers to believe that Alderete's appearance at the mall was related to the buy, especially because Charlan told Alderete that the drugs were in the trunk and Alderete walked with Charlan to the trunk. Although Alderete was not carrying the $20,000 that Charlan said defendant was going to pay, Alderete may have had good reasons for not carrying a large amount of money on his person when he went by himself to meet Charlan at an unanticipated location. He may not have intended to complete the drug buy at the mall; instead, he may have intended to facilitate the delivery of the drugs to defendant's house, where he had previously said he wanted the buy to occur, by helping Charlan with the car or by transporting Charlan and the drugs in defendant's car. Alderete's conduct is subject to competing reasonable inferences, but that does not mean that the officers did not have reasonable suspicion that he, as an agent of defendant, was engaged in a drug buy. *State v. Hiner*, 240 Or App 175, 181, 246 P3d 35 (2010) ("Reasonable suspicion, as a basis for an investigatory stop, does not require that the facts as observed by the officer conclusively indicate illegal activity but, rather, only that those facts support the reasonable inference of illegal activity by that person." (Citation omitted.)); *State v. Villemeyer*, 227 Or App 193, 198, 205 P3d 49 (2009) (that there may be innocent explanations for a person's behavior does not mean that the behavior "cannot

also give rise to reasonable suspicion of criminality" (citation and internal quotation marks omitted)).

In sum, we conclude that defendant's argument that his consent was involuntary because the officers ignored his request for an attorney and repeatedly prodded him to consent is unavailing because it is inconsistent with the trial court's fact findings, which are supported by the record. And, we also conclude that defendant's argument that his consent was involuntary because the police stopped him without reasonable suspicion fails because the stop was based on specific and articulable facts from which it could be reasonably inferred that defendant was involved in the purchase of drugs. Therefore, the trail court did not err in its partial denial of defendant's motion to suppress.

Affirmed.