Argued and submitted December 28, 1998, affirmed July 7, 1999

# STATE OF OREGON,
*Respondent,*

*v.*

# HERBERT ALAN GOSS, JR.,
*Appellant.*

## (Z434548, Z484338; CA A100239)

984 P2d 938

Kenneth E. Kahn II argued the cause and filed the brief for appellant.

Jonathan H. Fussner, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

DEITS, C. J.

## DEITS, C. J.

Defendant appeals his convictions for driving under the influence of intoxicants (DUII). ORS 813.010. He assigns error to the trial court's denial of his pretrial motions to suppress evidence of his refusal to perform field sobriety tests and of his refusal to take a breath test. We affirm.

The facts are undisputed. On May 18, 1997, Officer Higginbotham observed a small motor home drive through a red light at a Portland intersection. Higginbotham activated his overhead lights and siren and pulled up behind the motor home, but the motor home continued for several blocks before it stopped behind several cars at a red light. When the light turned green, Higginbotham again turned on his siren and the motor home then pulled over to the curb.

When Higginbotham asked the driver, defendant, for his driver's license and proof of insurance, defendant handed him his insurance card. Higginbotham noticed that defendant's eyes were glassy and his head movements were labored; he moved as if he had weights tied to his head. Defendant apologized and, after about 20 seconds, Higginbotham again asked for defendant's license. Defendant searched his pants pockets and glove box but was unable to find his license and apologized again. Defendant took a blanket and tried to cover a cooler between the front seats of the vehicle; however, he was unable to manipulate the blanket to cover up the cooler. Higginbotham testified that he smelled a strong mint odor like mint schnapps, an alcoholic beverage, on defendant.

Higginbotham asked defendant to step out of the motor vehicle. Defendant again attempted to cover up the cooler. He then got out of the vehicle, using the door to maintain his balance. Higginbotham observed defendant walk around the vehicle with his hand on the vehicle for balance. Defendant stumbled, swayed and continued to apologize. Higginbotham requested defendant's driver's license yet again. Defendant entered the vehicle through a side door, walked to the front of the vehicle, and tried to hide the cooler again. Defendant picked up his wallet near a sink and gave his license to Higginbotham. As he handed his driver's

license to Higginbotham, he said, "I know. Can I just park it here and get a ride?" As Higginbotham attempted to advise defendant of his *Miranda* rights, defendant said, "Can't you give me a break? I'm going to be in big trouble. Can't you help me out?" When Higginbotham asked him if he would perform field sobriety tests, defendant replied, "Come on. I'm going to be in big trouble." Higginbotham interpreted defendant's response as a refusal to perform the tests. After placing defendant under arrest, the police searched the cooler inside the vehicle and found four empty 12 ounce beer cans.[1]

Higginbotham transported defendant to the Traffic Division of the Portland Police Bureau. On the way to that office, defendant told Higginbotham that he had not had anything to drink since 2:00 p.m. and that he drank three beers with his father. He also said he had a lot to drink at the dog track, but that he had not had anything to drink after 11:00 p.m. the previous evening.

At the Traffic Division, Officer Akers took over the investigation. Defendant swayed as he stepped out of the police car and as he walked across the parking lot. Akers escorted defendant into an interview room, which contained an Intoxilyzer machine. Akers sat down facing defendant. He testified that he smelled a moderate to strong odor of alcohol on defendant's breath. He noticed that defendant's eyes were watery and bloodshot. He also observed that defendant slurred his speech and had a sleepy appearance. Akers advised defendant of his *Miranda* rights and completed a DUII interview and report form. *See* ORS 813.120. He advised defendant of the consequences of taking or refusing to take a breath test, *see* ORS 813.130, and then offered defendant an opportunity to take a breath test.

Defendant then asked to call his attorney. Akers looked up the attorney's phone number, dialed the number, and handed the phone to defendant. Defendant spoke briefly with his attorney in Akers's presence and then asked if he could have a private conversation with his attorney. Akers told defendant that he could not, because this was during the

---

[1] The trial court suppressed the evidence of what was inside the cooler. However, defendant's attorney later elected to admit that evidence for strategic reasons.

observation period before administration of a breath test and because of security reasons. Akers also spoke with defendant's attorney, who requested a private conversation with defendant. Akers told the attorney that he could not have a private conversation for the same reasons that he had told defendant. Defendant refused to take the breath test. He was convicted on one DUII charge after a stipulated facts trial. *See* ORCP 51 C(1). A jury convicted him on a second DUII charge.

In his first assignment of error, defendant argues that the trial court erroneously admitted evidence of his refusal to perform field sobriety tests, because he was not warned of the consequences of refusing to perform such tests and because defendant's refusal to perform field sobriety tests was testimonial and therefore, constituted an assertion of a constitutional right to remain silent, which the state may not use against a defendant. The state concedes that the trial court erred under *State v. Fish*, 321 Or 48, 893 P2d 1023 (1995), in admitting evidence of the refusal. *See also State v. Rohrs*, 157 Or App 494, 970 P2d 262 (1998), *rev allowed* 328 Or 464 (1999). The state contends, however, that this error was harmless.

In his second assignment of error, defendant argues that the trial court erroneously admitted evidence of his refusal to take a breath test because he was not allowed to speak privately with his attorney. The state responds that although a defendant has a right to a private phone conversation with his or her attorney before deciding whether to take a breath test, under some circumstances that right may be limited and that, under the circumstances here, the limits were permissible. Finally, the state argues that, even if the court erred in admitting the evidence of the refusal, that error was harmless.

We begin with defendant's second assignment of error that the trial court erred in failing to suppress the evidence of defendant's refusal to take the Intoxilyzer test, because he was denied a private conversation with his attorney. We review the denial of a motion to suppress defendant's refusal to take a breath test for errors of law. *See State v. Brazil-Kay*, 137 Or App 589, 593, 907 P2d 1116 (1995), *rev*

*den* 323 Or 484 (1996). In a criminal case, Article I, section 11, of the Oregon Constitution, requires that a driver accused of DUII must be afforded a reasonable opportunity to consult with counsel before deciding whether to submit to a breath test. *State v. Spencer*, 305 Or 59, 74-75, 750 P2d 147 (1988). The right to consult with counsel in a criminal DUII setting includes the right to a private consultation. *State v. Penrod*, 133 Or App 454, 457, 892 P2d 729 (1995); *see State v. Riddle*, 149 Or App 141, 146, 941 P2d 1079, *rev den* 326 Or 68 (1997). However, the state is correct that the right to a reasonable opportunity to obtain legal advice through a private consultation is not absolute. The degree of privacy allowed may be limited in order to conduct an accurate breath test, or it may be limited because of security considerations. *Penrod*, 133 Or App at 457. However, it is not enough for the state to establish that some limitation of a defendant's right to a private consultation was necessary to preserve evidence or for security reasons. The state must also justify the extent of the limitation under the particular circumstances. *See Penrod*, 133 Or App at 459 n 6.

■ The state first argues that the trial court correctly concluded that Akers was not required to allow defendant to speak privately with his attorney, because the need to administer a timely test and avoid diminution in blood alcohol evidence outweighed defendant's right to a private conversation. The state argues that Akers needed to be present during defendant's conversation with his attorney, because the conversation coincided with the 15-minute observation period before the administration of the breath test.[2] It asserts that restarting the observation period after allowing defendant a private conversation would have allowed his blood alcohol level to diminish significantly. The problem with the state's argument on this point, however, is that, as the state acknowledges, Akers testified that he could have restarted the observation period and that, in his opinion, defendant would still have been under the influence of intoxicants even

---

[2] The approved methods for operating an Intoxilyzer generally contain a pretest requirement that the operator be certain that the subject has not taken anything by mouth, vomited or regurgitated liquid from the stomach into the mouth for at least 15 minutes before taking the test. *See* OAR 257-030-0070(2)(a); OAR 257-030-0075(2)(a).

if the conversation with his attorney lasted for half an hour. Consequently, under the evidence in this record, the need to administer the test promptly did not justify denying defendant an opportunity to consult privately with his attorney.

The state also argues that security concerns justified denying defendant a private conversation with his attorney. The state first relies on a Portland Police Bureau policy that it asserts required Akers to keep defendant handcuffed and in his presence at all times in the building. In addition, the state argues that the configuration of the particular room used for the Intoxilyzer test did not allow a more private conversation and, accordingly, the police had no obligation to provide one.

■     As we explained in *Penrod*, valid security concerns may justify affording less than absolute privacy to an accused who is seeking legal advice regarding a breath test. However, as noted above, it is incumbent upon the state to show that the limitation was justified under the circumstances. *Penrod*, 133 Or App at 459 n 6. We first hold that a general policy that a defendant must be handcuffed and in an officer's presence at all times, in itself, does not justify the denial of a private conversation under all circumstances. The particular circumstances of each case must be considered.

■     Considering the circumstances here, we do not believe that the evidence in the record supports the trial court's conclusion that security concerns justified limiting defendant's right to a private conversation. The trial court found that Akers would have been within earshot of a normal conversation when standing outside the room where defendant was located. The trial court's conclusion was apparently based on the court's own examination of photographic exhibits of the room. However, the evidence in the record does not support that conclusion. There was testimony from another police officer who had stood outside the same room on a different occasion that he had been unable to hear a defendant talking inside. The photographic evidence of the room shows, as defendant's attorney suggested to the trial court, that Akers could have closed the door to the interview room and observed defendant through a window in the door. There is no evidence that the officer could have overheard defendant's

conversation if he had closed the door and stood outside the room. Further, there is no evidence that defendant posed any type of security threat that justified Akers's presence in the room, instead of, for example, just outside the door. Akers testified that defendant was not threatening, did not attempt to escape, and did not attempt to damage any property. In short, the evidence does not justify the extent of the limitation on defendant's right to a private consultation with his attorney.

■ The state also argues that the refusal should not be suppressed, because defendant failed to establish that the lack of an opportunity for a private conversation impaired his ability to consult with his attorney. However, even assuming the state is correct that defendant must show such a causal connection, defendant's request to have a private conversation with his attorney demonstrates a sufficient connection to place the burden on the state to justify the extent of the limitation.[3] *See State v. Spencer,* 305 Or at 76. As in *Riddle,* it is reasonable to assume that Akers's presence in the room chilled defendant's ability to communicate with his attorney. Moreover, the evidence shows that the lack of privacy affected defendant's decision. Defendant told Akers that he would not take the breath test because of a lack of a private conversation.

We conclude that the trial court erred in denying defendant's motion to suppress evidence of his refusal to take the breath test. The state failed to justify the complete denial of defendant's ability to consult privately with his attorney, and that lack of privacy affected defendant's refusal to take the test.

■ ■ We next turn to the state's contention that, even if admitting evidence of defendant's refusal to perform field sobriety tests and to take the breath test was error, it was harmless. An evidentiary error is not presumed to be prejudicial and will not require reversal if there is little likelihood

---

[3] *As we explained in* Penrod *and* Riddle, *once the state produces evidence to justify limitation of a defendant's right to consult privately with an attorney, the burden then shifts to the defendant to produce evidence that less intrusive measures, affording a greater degree of privacy, were available. See Penrod,* 133 Or App at 459 n 6; *Riddle,* 149 Or App at 147.

that the error affected the verdict. *State v. Hansen*, 304 Or 169, 180, 743 P2d 157 (1987); *State v. Scott*, 121 Or App 308, 313, 854 P2d 991, *rev den* 318 Or 27 (1993). Higginbotham had extensive contact with defendant and the opportunity to observe defendant during their encounter. He testified that defendant drove through a red light and ignored his initial attempts to stop him. He also testified that defendant had trouble with motor coordination when the stop occurred and made numerous unsuccessful attempts to hide the cooler in his motor home. Higginbotham and Akers both testified that defendant had trouble walking and smelled of alcohol. Both noticed defendant's eyes. Higginbotham testified that they were glassy; Akers described them as watery and bloodshot. Akers testified that defendant was "obviously under the influence of intoxicants." Defendant made conflicting statements to Higginbotham about when he last consumed alcohol and incriminating statements, such as when he asked Higginbotham to "give [him] a break" and when he said that he "was going to be in big trouble." Akers testified that defendant's speech was slurred. In short, there was highly persuasive evidence of defendant's intoxication. Accordingly, we conclude that there is little likelihood that the admission of defendant's refusals to perform field sobriety tests and to take the breath test affected his convictions.

Affirmed.