Argued and submitted October 5, 2004; resubmitted en banc May 16, affirmed September 21, 2005

STATE OF OREGON,
*Respondent,*

*v.*

CORY LYNN SCHNEIDER,
*Appellant.*

C002925CR; A118922

120 P3d 16

John Henry Hingson III argued the cause and filed the brief for appellant.

Ryan Kahn, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Schuman, Ortega, and Rosenblum, Judges.

LANDAU, J.

c

**LANDAU, J.**

Defendant appeals a judgment of conviction for assault in the fourth degree, ORS 163.160, two counts of recklessly endangering another person, ORS 163.195, criminal mischief in the second degree, ORS 164.354, reckless driving, ORS 811.140, and driving under the influence of intoxicants (DUII), ORS 813.010. He advances a number of assignments of error ranging from the denial of a motion to dismiss on speedy trial grounds to the denial of his motion to suppress evidence and the failure of the trial court to deliver his requested instructions. We conclude that none of the assignments has merit and affirm.

We begin with a brief recitation of the factual background and then refer to additional facts pertinent to individual assignments of error as necessary. On March 9, 2000, defendant rear-ended a car that was stopped for a red light. That car was pushed into another car in front of it. A police officer responding to the accident smelled alcohol on defendant's breath and observed that defendant swayed from side to side and leaned on the tailgate of his pickup truck for balance. The officer asked defendant to perform field sobriety tests, which defendant agreed to do. Based on the results of those tests, the officer concluded that defendant had been consuming alcohol and was impaired. He arrested defendant for DUII and took defendant to the police station to administer a breath test. Defendant's blood alcohol content was .19 percent.

Defendant was indicted by a grand jury on October 26, 2000, on two counts of assault in the fourth degree, two counts of recklessly endangering another person, two counts of criminal mischief in the second degree, reckless driving, and driving under the influence of intoxicants. Trial took place on June 4, 2002. A jury found defendant guilty of six of those counts.

On appeal, defendant assigns error to eight different rulings by the court. We consider each in turn.

A. *Motion to dismiss on speedy trial grounds*

1. *Relevant facts*

Defendant was originally cited on March 9, 2000. The following month, the prosecutor dismissed the citation and swore out a complaint against defendant that included eight misdemeanor counts. The prosecutor later dismissed the complaint as well and, on October 26, 2000, obtained a grand jury indictment on the same eight counts.

At defendant's arraignment on October 27, 2000, the trial court initially set a pretrial conference hearing date for December 18, 2000. Defendant's counsel asked if he could have another pretrial conference date because he was scheduled that day for a trial in a different matter. The court said, "You can have December 26th," to which defense counsel replied, "That works."

At the pretrial conference held on December 26, 2000, defendant rejected the state's plea offer, and thereafter, the following colloquy took place:

"THE COURT: Okay. We have a trial date then. Is that July 10th, the trial, and then call July 6th?

"[Defense Counsel]: Yes.

"THE COURT: Okay. Nine a.m. in the morning. All right. Thank you.

"[Defense Counsel]: Thank you very much."

Two weeks before trial, on June 27, 2001, the state moved for a continuance. In support of the motion, the prosecutor submitted an affidavit that, among other things, stated that defendant's counsel "does not object to this reset." The trial court reset the trial date for December 11, 2001, with a call date of December 7.

On December 7, 2001, defendant appeared at call, but there were not enough judges available for trial on the scheduled trial date. Trial was set over until June 4, 2002.

On May 6, 2002, defendant moved to dismiss on statutory speedy trial grounds. The trial court denied the motion. The court calculated the period of delay by starting with the date of indictment, October 26, 2000, which produced a total

delay of 19 months and nine days. The court then deducted any periods of delay that defendant either caused or acquiesced in. According to the trial court, defendant had acquiesced in the delay from July 10, 2001 to December 11, 2001, a period of five months and one day. The court then concluded that the remaining delay of 14 months and eight days was not unreasonable, particularly given the principal reason for it, namely, the lack of judicial resources to try the case.

2. *Analysis*

1.    ORS 135.747 provides:

"If a defendant charged with a crime, whose trial has not been postponed upon the application of the defendant or by the consent of the defendant, is not brought to trial within a reasonable period of time, the court shall order the accusatory instrument to be dismissed."

Whether a period of time before trial is unreasonably long within the meaning of that statute, is a question of law. *State v. Johnson*, 339 Or 69, 86-87, 116 P3d 879 (2005); *State v. Rohlfing*, 155 Or App 127, 129, 963 P2d 87 (1998). In this case, defendant argues that the trial court's denial of his motion to dismiss on speedy trial grounds was incorrect as a matter of law in two respects. First, he argues that the trial court used the wrong starting date in calculating the period of delay. Second, he argues that, in any event, the court erred in concluding that the delay was not unreasonable.

a.    Starting date

In his brief on appeal, defendant conceded that the trial court "correctly calculated the length of time from the date of the filing of the indictment to the date of trial * * *." At oral argument, however, defendant suggested that the trial court actually erred in using the date of indictment as the starting date. According to defendant, the appropriate starting date for statutory speedy trial purposes should be the date of original citation, that is, March 9, 2000.

We are not inclined to entertain a new argument—indeed, one that is directly contrary to a concession made in the opening brief—raised at the podium during oral argument. *See, e.g., State v. Jones*, 184 Or App 57, 60 n 2, 55 P3d

495 (2002) ("At oral argument, defendant contended for the first time on appeal that the charges were not of the same or similar character. Because defendant did not raise that issue in his opening brief, we decline to reach it here."); *Summer Oaks Limited Partnership v. McGinley*, 183 Or App 645, 656 n 6, 55 P3d 1100, *rev den*, 335 Or 255 (2002) ("At oral argument, defendants, for the first time, argued that we should uphold the award of attorney fees regardless of our disposition of plaintiffs' appeal. We decline to address the merits of that unpreserved argument."); *Hayes Oyster Co. v. Dulcich*, 170 Or App 219, 237 n 20, 12 P3d 507 (2000) (rejecting issue raised for the first time in the reply brief).

■ Even assuming that the argument has been properly raised, however, it is not well taken. Our decision in *State v. Hampton*, 152 Or App 742, 954 P2d 1267 (1998), is directly on point as to how the appropriate starting date is determined. In that case, the defendant received a citation for DUII, and a trial was scheduled. After several setovers, the state dismissed the citation and issued another. The trial was reset. The defendant moved to dismiss on statutory speedy trial grounds. The initial issue was how to calculate the starting date for statutory speedy trial purposes. We concluded that "the date the charge was *reissued* following the first dismissal is the starting point for calculating the period of time it took the state to bring defendant to trial." *Id.* at 745 (emphasis added).

Defendant insists that, more recently, the Supreme Court determined in *State v. Vasquez*, 336 Or 598, 605, 88 P3d 271 (2004), that any "official action commencing a prosecution" triggers the speedy trial clock and that, in this case, that means that the clock started running in March 2000, the date of the original citation. *Vasquez*, however, involved the construction of the speedy trial provision of Article I, section 10, of the Oregon Constitution, as that provision would have been understood by the framers in 1857. *Id.* at 604-11. The court, in fact, took some pains to explain that its constitutional decision involved different interpretive and analytical issues than are involved in statutory speedy trial cases. *Id.* at 612. Nothing in *Vasquez* suggests that our holding in *Hampton* is no longer tenable. We therefore conclude that, consistently with *Hampton*, the starting date for statutory

speedy trial purposes in this case is the date of indictment, October 26, 2000.

      b.   Reasonableness of delay

■      We turn to the question whether the delay of 19 months and nine days between defendant's indictment on October 26, 2000, and his trial on June 4, 2002, violated defendant's right to a speedy trial under ORS 135.747. Determining the reasonableness of that delay involves two questions. First, to which portions of that period of delay, if any, did defendant consent? Second, was the remaining time reasonable? *State v. Bigelow*, 197 Or App 441, 446, 106 P3d 162, *rev den*, 339 Or 544 (2005).

■      We begin by identifying any portions of the total period of delay to which defendant consented. "Consent" in that respect does not include a mere failure to object. *State v. Adams*, 339 Or 104, 109, 116 P3d 898 (2005). In this case, the total period of delay may be divided into four portions.

      The first portion is the 60 days from October 26, 2000 to December 26, 2000, that is, the period running from the date of indictment to the first scheduled trial date. When the court scheduled the December 26 pretrial conference date, defense counsel replied, "That works." In *State v. Peterson*, 183 Or App 571, 574, 53 P3d 455 (2002), the trial court suggested a trial date, and the defendant's lawyer replied, "Okay. That would do it." We concluded that the statement constituted express consent to the delay until the trial date. *Peterson* is materially indistinguishable from this case. We conclude that defendant consented to the delay from October 26, 2000 to December 26, 2000.

      The second portion of the total period of delay runs from December 26, 2000 to July 10, 2001, the rescheduled trial date. The trial court suggested a trial date of July 10, and defendant's counsel replied, "Thank you very much." The state argues that, as in *Petersen*, defendant consented to the delay. We do not agree. As we have noted, "consent" for purposes of statutory speedy trial analysis does not include a mere failure to object. *Adams*, 339 Or at 109. We conclude that defendant did not consent to the delay from December 26, 2000 to July 10, 2001.

The third portion of the total period of delay runs from July 10, 2001 to December 11, 2001, when the state requested a setover and represented that defendant's counsel "does not object to this reset." The trial court concluded that defendant consented to that delay, and defendant does not argue to the contrary on appeal. We therefore deduct that period from the total period of delay.

The fourth and final portion of the total period of delay runs from December 11, 2001 to June 4, 2002, when the case finally went to trial. As we have noted, the reason for the delay was the fact that the court had an insufficient number of judges available for trial on the scheduled trial date of December 11. The state agrees that defendant did not consent to that delay.

The total period of delay for statutory speedy trial purposes, therefore, is 12 months and nine days. The question is whether that period of delay is reasonable. The state argues that the period of delay is reasonable in light of the fact that, among other things, it was occasioned in substantial part by a lack of judicial resources. Defendant does not contest that the delay, in fact, was caused by the lack of resources, but he does contend that that fact is not relevant to a determination whether the period of delay is or is not reasonable.

ORS 135.747 provides that the court must dismiss an accusatory instrument if a defendant is not brought to trial within a "reasonable time." The question whether a period of delay is reasonable "involves examination of all the attendant circumstances." *Johnson*, 339 Or at 88. Among the attendant circumstances that may be relevant to assessing the reasonableness of delay are a trial court's caseload and the availability of judges to dispose of it. As the Supreme Court explained in *Adams*,

> "For the purposes of ORS 135.747, a 'reasonable period of time' is 'such length of time as may reasonably be allowed or required having regard to attendant circumstances.' *State v. Emery*, 318 Or 460, 467, 869 P2d 859 (1994) (quoting *State v. Jackson*, 228 Or 371, 377, 365 P2d 294 (1961)). The 'attendant circumstances' include the circumstances that cause delay, *i.e.*, the reasons for delay. *State v. Johnson*, 339

Or 69, 88, 116 P3d 879 (2005). This court's older cases hold
that a trial court has 'good cause' to continue a trial until a
later date if it has no room for the case on its present docket.
*See, e.g., State v. Bateham*, 94 Or 524, 529, 186 P 5 (1919)
(continuing case for lack of judicial time is 'good cause' for
denying statutory speedy trial motion); *State v. Lee*, 110 Or
682, 687, 224 P 627 (1924) (right to speedy trial not contra-
vened when 'accumulation of business render[s] trial
impossible'); *State of Oregon v. Kuhnhausen*, 201 Or 478,
537-38, 266 P2d 698, [*on reh'g*,] 272 P2d 225 (1954) (trial
court may find that an accumulation of cases already set
constitutes good cause for continuing a criminal case). That
principle recognizes the obvious fact that trial courts must
have some ability to reschedule proceedings to deal with an
unpredictable workload. The trial courts, in other words,
must have control over their own dockets."

339 Or at 110-11. The court cautioned, however, that "the
fact of an overcrowded docket can go only so far in expanding
the period of time that will be considered 'reasonable' for pur-
poses of ORS 135.747."[1] *Id.* at 111. Thus, in that case, the
court concluded that the total period of delay—23 months in
a DUII case—was simply too long to be reasonable, even
assuming that it was occasioned by an overcrowded docket.
*Id.*

In *Johnson*, the court added a further qualification
to the notion that an overcrowded docket may justify a delay
in bringing a case to trial, namely, that the record of each
case must demonstrate precisely how an overcrowded docket
contributed to the period of delay at issue. In that case, the
state argued that "resource deficiencies in the Oregon state
court system" accounted for a delay of 21 months in bringing
the defendant into court on various felony charges. 339 Or at
89. The court rejected the argument because, among other

---

[1] The court also cautioned that the fact that docket congestion arises out of
decisions of legislative policy such as restricted budgets does not make the docket
congestion more or less compelling as a justification for delay than it would other-
wise be. 339 Or at 111. "[T]he fact that docket congestion ultimately arises out of a
legislative policy," the court explained, "neither expands (as the state argues) nor
contracts (as the trial court apparently believed) the period of time that otherwise
would be considered reasonable." *Id.* In other words, the proper focus is on the
nature of the congestion that exists and the reasonableness of a court's response to
it, regardless of the fact that the congestion may have been occasioned by legisla-
tive budget priorities.

things, "[n]othing in the present record * * * gives us any insight into the status of that docket," much less why the condition of the docket explained the delay of 21 months. *Id.*

With the foregoing principles in mind, we turn to the reasonableness of the delay in this case. As we have noted, the trial court found that approximately six months of the 12-month-and-nine-day period of delay was occasioned by a shortage of judges. Defendant does not contest that. Nor does defendant contend that the state failed to make an adequate record as to the reasonableness of the trial court's response to the shortage of judges. Defendant's sole argument is that the shortage of judges is irrelevant, as a matter of law. As we have noted, that is incorrect.

We turn, then, to the remaining question whether, in light of the reason for the delay, the period of 12 months and nine days was unreasonable. In *State v. Davids*, 339 Or 96, 116 P3d 894 (2005), the Supreme Court concluded that the state's delay of approximately 12 months to arrest the defendant on a previously issued indictment for DUII was unreasonable. The court noted that, at trial, the state offered no explanation for the delay except to note that it was not able to serve the warrant any earlier and that the trial court apparently concluded "that the delay was the product of simple neglect." *Id.* at 101. On appeal, the state argued for the first time that budgetary constraints were the apparent cause of the delay. The court, however, found no support in the record for that contention. It concluded that, given "the state's failure to offer any reasons for that delay to the trial court" and the lack of any support in the record for its explanation on appeal, the delay was unreasonable. *Id.* at 103.

This case is clearly distinguishable. As we have noted, the issue of the unavailability of judges was squarely before the court and, in fact, was the express basis for the court's decision to delay the trial. No one contests the sufficiency of the record to support the court's decision in that regard. Thus, we are not confronted by an unexplained delay of 12 months, as in *Davids*. In light of the uncontested justification for six months of the delay, we conclude that the total delay of 12 months and nine days was not unreasonable and

that the trial court did not err in denying defendant's motion to dismiss on statutory speedy trial grounds.

## B. *Motion to suppress*

### 1. *Relevant facts*

Hillsboro Police Officer Fresh arrested defendant for DUII and took him to the police station for a breath test. Fresh recited the rights and consequences pertaining to the breath test, as required by ORS 813.100. He then administered the test. The test results showed that defendant's blood alcohol content was .19 percent.

Defendant moved to suppress the results of the breath test. Among other things, he argued that, under Article I, section 11, of the Oregon Constitution and the Supreme Court's interpretation of it in *State v. Spencer*, 305 Or 59, 750 P2d 147 (1988), he had a right to consult with counsel before deciding whether to take the test. The state responded that, under *Spencer*, the defendant had a right to consult with counsel only "upon request." In this case, the state argued, there is no evidence that defendant made such a request. The trial court denied the motion.

### 2. *Analysis*

On appeal, defendant repeats his argument that, under *Spencer*, he was entitled to consult with counsel. He acknowledges that the court in that case stated that an arrested driver has the right to a reasonable opportunity to consult with counsel "upon request," but he insists that "[t]here was no suggestion in *Spencer* that the court, in using the phrase 'upon request,' intended to mean that the right to counsel depended upon a request for counsel." The state responds that *Spencer* simply means what it says and that, in this case, there is no evidence that defendant requested to consult with counsel before taking the breath test. We agree with the state.

In *Spencer*, the defendant was arrested for DUII and taken to the county jail, where he was asked to submit to a breath test. The defendant asked whether he could call his attorney before deciding whether to submit to the test. He was told that he could not do so. He submitted to the test but

later moved to suppress its results on the ground that he had been denied his right to contact his attorney. The Supreme Court agreed with the defendant that, "under the right to counsel clause in Article I, section 11, [of the Oregon Constitution,] an arrested driver has the right *upon request* to a reasonable opportunity to obtain legal advice before deciding whether to submit to a breath test." *Spencer*, 305 Or at 74-75 (emphasis added).

The Supreme Court again addressed the scope of the right to counsel before a breath test in *State v. Durbin*, 335 Or 183, 63 P3d 576 (2003), a case in which the defendant was permitted to consult with counsel, but only within earshot of a police officer. The court began by reviewing its decision in *Spencer* and concluding that, under that decision, "*when an arrested driver requests counsel*, Article I, section 11, requires that the police afford the driver a reasonable opportunity to obtain legal advice." *Durbin*, 335 Or at 191 (emphasis added). The court suggested that, to comply with Article I, section 11, "police might find it preferable to inform the driver of their intent to administer the breath test and then, *if the driver requests counsel*, to allow the driver a reasonable time in which to seek legal advice, in private, before beginning the required observation period." *Id.* at 194 (emphasis added).

Defendant insists that, notwithstanding the phrasing of the relevant portions of *Spencer* and *Durbin*, the right to counsel should not depend on a defendant making a request for counsel. Citing *State ex rel Juv. Dept. v. Sanders*, 56 Or App 724, 731, 643 P2d 384 (1982), defendant argues that, just as the right to counsel at trial does not depend on a request for counsel, so also should the right to counsel at earlier stages in the process not depend on such a request.

The Supreme Court, however, has made clear that, under Article I, section 11, "the right to counsel [at the breath-test] stage of the criminal prosecution is not as broad as the right to counsel that an accused enjoys at trial." *Durbin*, 335 Or at 189 (citing *Spencer*, 305 Or at 74-75). The court has plainly stated that, at the breath-test stage of proceedings, the right to counsel is triggered by a defendant's request. In this case there was no such request. The trial court did not err in denying defendant's motion to suppress.

## C. *Motion for reconsideration*

Defendant separately assigns error to the trial court's denial of his motion for reconsideration of the denial of his motion to suppress. It is not clear that the ruling is separately reviewable. *Cf. Carter v. U.S. National Bank,* 304 Or 538, 546, 747 P2d 980 (1987) (Peterson, C. J., concurring) ("Use of such motions creates uncertainty and should be discouraged."). In any event, defendant does not offer any argument in support of the assignment that he did not already advance in support of the previous assignment. We reject it without further discussion.

## D. *Objection to admissibility of results of breath test*

### 1. *Relevant facts*

As we have noted, Fresh arrested defendant for DUII and took him to the police station for a breath test. He advised defendant of the rights and consequences required by the implied consent law, and defendant agreed to take the test. Fresh did not inform defendant of his *Miranda* rights at that time.

As part of the test itself, Fresh was required to be "certain" that defendant had "not taken anything by mouth (drinking, smoking, eating, taking medication, *etc.*), vomited, or regurgitated liquid from the stomach into [the] mouth, for at least fifteen minutes before taking the test." OAR 257-030-0070(2)(a). Fresh observed defendant for the requisite 15 minutes and then asked him whether he had coughed or regurgitated anything. Defendant answered, "No."

At trial, defendant objected to the admissibility of the test results on the ground that, when Fresh asked defendant whether he had coughed or regurgitated anything in the previous 15 minutes, Fresh had interrogated defendant without first giving him *Miranda* warnings. Because Fresh relied on unlawful interrogation to satisfy the requirement that he be "certain" that defendant had not coughed or regurgitated, defendant argued, the foundation for the breath test was, in fact, not satisfied. The state argued that Fresh's question was similar to the "routine booking questions" that may be asked without implicating *Miranda* and that, in any event, the questioning merely confirmed what the officer already had

observed and therefore did not serve as the foundation for the test itself. In support, the state relied on Fresh's testimony:

"Q. [By prosecutor]   Okay. You also observed [defendant] during [the pre-test] period of time?

"A.   Yes.

"Q.   And your observations are also that he had not coughed or regurgitated anything?

"A.   That's correct.

"Q.   And [defendant] replied, 'No.' So you then administered the test; is that correct?

"A.   Yes.

"* * * * *

"Q.   Okay. His answer, 'no' was consistent with your observations anyway?

"A.   Yes, sir.

"* * * * *

"Q. [By defense counsel]   Without the question that you put to him and his answer, were you certain that he had not done those things?

"A.   To the best of my knowledge.

"* * * * *

"Q.   Okay. Could you have been certain without your question and his answer?

"A.   Yes.

"Q.   The question and the answer were just icing on the cake?

"A.   Just confirmation."

The trial court agreed with the state, concluding that Fresh's question was "similar to a routine booking question, and not in the nature of a testimonial question which would clearly be inadmissible against [defendant]."

2. *Analysis*

On appeal, defendant argues that the trial court erred in concluding that Fresh's question whether defendant

had recently coughed or regurgitated before administering the breath test did not amount to unconstitutional interrogation. The state reiterates its arguments that the questioning itself was permissible and that, in any event, it did not serve as the foundation for the test. In reply, defendant insists that Fresh satisfied himself that defendant had not coughed or regurgitated only after questioning defendant and, as a result, the unlawfulness of the questioning is determinative.

Thus, the parties agree that, if Fresh in fact was "certain" without the answers to his questions, then the lawfulness of the questions becomes irrelevant. We therefore begin with that issue.

As we have noted, OAR-257-030-0070(2)(a) requires the person administrating the breath test to be "certain" that the subject has not, among other things, vomited or regurgitated during the period of observation. The rule does not require that the person administering the test question the subject about that. To comply with the requirement, "the operator of the test [must] form a subjective belief to the degree of 'certainty' that the test subject has not engaged in any of the acts described by the rule[,]" and that subjective belief must be "reasonable under the circumstances." *State v. Tynon*, 152 Or App 693, 696, 955 P2d 250 (1998), *rev den*, 328 Or 365 (1999). "[A]bsolute certainty is not required[.]" *State v. Lessar*, 105 Or App 512, 517, 805 P2d 730, *rev den*, 311 Or 482 (1991) (interpreting rule).

In this case, defendant's counsel asked Fresh, "Without the question that you put to [defendant] and his answer, *were you certain* that he had not done those things?" (Emphasis added.) And Fresh replied that, to the best of his knowledge, he was certain. In fact, Fresh answered repeatedly that he had actually observed that defendant had not vomited or regurgitated and agreed that the question and answer were "just icing on the cake." The uncontradicted evidence is that Fresh subjectively believed that defendant had not vomited or regurgitated before the test, and nothing in the record suggests that the belief was unreasonable. The answers to Fresh's questions therefore were not necessary to satisfy the requirements of OAR 257-030-0070(2)(a). We conclude that

the trial court did not err in overruling defendant's objection to the admissibility of the breath test results.

### E. *Motion to strike and motion for mistrial*

In his fifth and sixth assignments of error, defendant challenges the trial court's decision to permit a witness to testify that a blood alcohol content of .19 percent gives rise to a presumption that the subject is under the influence of intoxicants. Because both assignments implicate essentially the same arguments, we consider them together. ORAP 5.45(6).

### 1. *Relevant facts*

At trial, defendant offered the testimony of his friend Osterholme, who was a former state trooper. On direct examination, Osterholme testified that he had seen defendant on the night of defendant's arrest and that defendant did not appear to be affected by alcohol. On cross-examination, the prosecutor questioned Osterholme about his experience as a state trooper in observing and evaluating people under the influence of alcohol. The prosecutor asked, "And if somebody blew a .19 in the Intoxilyzer test, what would that indicate to you?" Osterholme answered, "It would be a presumption they were under the influence."

Defendant objected and moved to strike the testimony, arguing that it was irrelevant under *Chartrand v. Coos Bay Tavern*, 298 Or 689, 696 P2d 513 (1985). The trial court denied defendant's motion to strike.

Defendant later moved for a mistrial:

> "May it please the court. The cross-examination of Mr. Osterholme elicited testimony that a .19 means that there's a presumption the person's under the influence. You denied my objection to that testimony and you denied my motion to strike. It is incumbent upon me to move for a mistrial at this stage of the proceedings. That is exactly the type of evidence that resulted in the reversal of a huge plaintiff's verdict in the case of *Chartrand*."

The trial court denied that motion as well.

## 2. *Analysis*

On appeal, defendant argues that both rulings were erroneous because, under *Chartrand*, a witness may not testify that a particular breath test result creates a presumption that one is under the influence. The state contends that defendant has misread the holding of *Chartrand*, that its holding is inapposite to the facts and issues of this case, and that the legislature has, in fact, provided that a blood alcohol level of .08 or above "constitutes being under the influence of intoxicating liquor." ORS 813.300(2). We conclude that the state is correct in each respect.

We review the question of admissibility for errors of law, *State v. Grey*, 175 Or App 235, 245, 28 P3d 1195 (2001), *rev den*, 333 Or 463 (2002), and the court's ruling on the mistrial motion for an abuse of discretion, *State v. Terry*, 333 Or 163, 175-76, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002).

*Chartrand* was a personal injury action in which the plaintiff sued a tavern owner who served alcohol to a customer who was "visibly intoxicated." 298 Or at 691. The customer left the tavern and negligently drove her vehicle into a head-on collision with the plaintiff. *Id.* The plaintiff offered the testimony of a police officer who stated that, under Oregon law, " 'you are under the influence if your blood alcohol level is over .10 percent.' " *Id.* at 698. The defendant objected to the testimony, arguing that it was irrelevant to the question that the jury must determine, *i.e.*, whether the person was "visibly intoxicated." The Supreme Court agreed:

"[T]he fact that the state legislature has adopted a certain percentage of alcohol in the blood as legally constituting being under the influence of intoxicants is not relevant circumstantial evidence that the driver was visibly intoxicated. The legal standard does not prove that fact, nor tend to prove that fact."

*Id.* at 700-01.

Thus, the point of the decision was that the legal standard to which the witness had referred simply did not pertain to the standard that governed the issues in the case. In this case, in contrast, there is no such discontinuity. Defendant was charged with, among other things, driving

under the influence of intoxicants. ORS 813.010. Under that criminal statute, "[a] person commits the offense of driving while *under the influence of intoxicants*, if the person drives a vehicle while the person * * * has .08 percent or more [blood alcohol content]." (Emphasis added.) ORS 813.300(2) similarly provides that "[n]ot less than .08 percent [blood alcohol content] *constitutes being under the influence of intoxicating liquor.*" (Emphasis added.)

Osterholme's testimony thus pertains to the very issue before the court, that is, whether defendant was "under the influence of intoxicants." The trial court did not err in denying defendant's motions to strike and for a mistrial.

F.  *Second motion for mistrial*

1.  *Relevant facts*

In his closing argument, defendant called into question whether the Intoxilyzer machine was completely operational. In rebuttal, the prosecutor replied:

"But this is our result. This is our result, .19. And it's unrefuted. He never once presented this to [the expert witness] and said, 'Refute this.' He couldn't. He wouldn't. Because he knows that this is a valid sample."

Defendant objected:

"Your Honor, I object to the district attorney arguing that I, [defense counsel], know that this is a valid sample on numerous grounds. The first is that it argues facts outside the evidence. Secondly, injecting my knowledge as to the validity of a test is irrelevant and extraneous to the issues that the jury must consider and decide in this case. And this is an attack upon defense counsel that is entirely unwarranted and is forensic misconduct. Upon those various grounds, I object."

The trial court concluded that the prosecutor's statement was "an assertion by the State that defense counsel knew something and had knowledge that would have been [facts outside the evidence]," sustained the objection, and informed the parties that it intended to instruct the jury to disregard the remark.

Defendant moved for a mistrial. The trial court denied the motion. The court explained:

"Feelings run strong between counsel when it is a contested case, our jury is sophisticated enough to figure that out, but they need to be warned not to consider the evidence that is not in the record and knowledge regarding [defense counsel] is not in the record. And it needs—that needs to be—the jury needs to disregard that and I will so instruct them."

The trial judge further stated that "limiting instructions have been made along the way where I have deemed that those were necessary. I'm confident that we have a jury that is able to understand a limiting instruction." Later, the court delivered the following limiting instruction to the jury:

"I want to instruct you with respect to argument of counsel that if argument—where the argument may have included that defense counsel had any special knowledge of any facts or circumstances, you need to disregard. That kind of argument is inappropriate to argue that the defense attorney would have had special knowledge of facts. To the extent any argument contains those kinds of matters, that should be disregarded by the jury."

## 2. *Analysis*

On appeal, defendant argues that the trial court erred in denying his motion for a mistrial. He argues that he was prejudiced by the prosecutor's statement and that the trial court's curative instruction was insufficient to remedy that prejudice. Defendant contends that the prosecutor's statement not only argued facts outside the record but that the prosecutor also effectively "called defense counsel a liar." Defendant argues, "Perhaps if the court had instructed the jury that it was unethical for the prosecutor to argue facts outside the record, the 'playing field' may have been made more level."

In *Terry*, the Supreme Court explained that

"[t]his court reviews a trial court's decision to deny a mistrial motion for abuse of discretion. We recognize that '[t]he trial judge is in the best position to assess the impact of the

complained-of incident and to select the means (if any) necessary to correct any problem resulting from it.' *State v. Wright*, 323 Or 8, 12, 913 P2d 321 (1996)."

333 Or at 175-76 (citations omitted). In this case, we cannot say that the trial court abused its discretion. Defendant does not argue that the substance of the trial court's instruction was incorrect. He argues only that the instruction was too "bland." According to defendant, the one possible curative instruction that might have been sufficient is one that would have stated that the prosecutor had acted unethically. We fail to see how that would have solved defendant's claims of prejudice. Moreover, to the extent that defendant is arguing that there was no curative instruction that could have "neutralized the possibility of prejudice to the defendant," *id.* at 177, we are satisfied that the trial court sufficiently considered the jury's ability to follow a curative instruction. The trial court did not abuse its discretion in denying the motion for a mistrial.

G. *Jury instruction*

1. *Relevant facts*

At trial, the state offered into evidence two documents by two different technicians certifying the accuracy of the breath-testing equipment. Defendant did not object to the exhibits. At the end of the trial, defendant requested the following jury instruction:

"When you evaluate the evidence, you may consider the power of the state to gather and produce evidence. If the evidence offered by the state was weaker and less satisfactory than other stronger or more satisfactory evidence which the state could have offered, then you should view the weaker and less satisfactory evidence with distrust."

In making that request, defendant argued that, in using the exhibits, the state "relied upon paper evidence as opposed to person evidence." Defendant argued:

"And certainly, a person, a live person is more satisfactory evidence than a mere piece of paper as to what a person says with respect to testing and accuracy of a breath test machine. And I think we would all agree that a live person

is subject to confrontation, cross-examination, demeanor evidence, and that's better evidence than paper evidence."

The trial court did not give the requested instruction.

### 2. *Analysis*

On appeal, defendant argues that the requested instruction was necessary, because the paper evidence was weaker evidence than live testimony. The state argues that the record in this case does not support the delivery of the requested instruction. "We review a trial court's refusal to give a requested jury instruction for error as a matter of law." *State v. Moore*, 324 Or 396, 427, 927 P2d 1073 (1996).

In *State v. McDonnell*, 313 Or 478, 837 P2d 941 (1992), the court was asked to determine when the "weaker and less satisfactory evidence" jury instruction should be given. It held:

"In sum, in a criminal case, the statutory 'less satisfactory evidence' instruction, ORS 10.095(7) and (8), should rarely be given. It may, however, be appropriate 'where because of an asserted affirmative defense the defendant has the burden of proof on an issue in the case.' [*State v. Mains*, 295 Or 640, 657-58, 669 P2d 1112 (1983).] Moreover, it may be appropriate in a criminal case where the state's failure to produce evidence could give rise to an inference that the evidence would be adverse to the state—that is, when it appears that the state may be trying to hide something, or in a case where the record indicates that the state possessed and failed to produce stronger evidence. In such a case, however, the instruction may be given only *if there is evidence in the record to support it*. Generally, the instruction need not be given where the other evidence would be merely cumulative."

*McDonnell*, 313 Or at 503 (citations omitted; emphasis in original).

Defendant does not argue that any of those factors applied, and we find nothing in the record to suggest that they did. Defendant did not have the burden of proof with regard to whether the Intoxilyzer machine was operational. There is nothing in the record to suggest that the state failed to offer the live testimony of the two technicians because it was trying to hide something. There is nothing in the record

to suggest that the state was able to offer the live testimony of the two technicians or that the live testimony would be stronger than the paper evidence. We conclude that the trial court did not err in refusing to give the requested jury instruction.

Affirmed.